*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0352p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ELWOOD H. JONES,

        *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

        *Respondent-Appellee.*

No. 10-3339

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:01-cv-564—Thomas M. Rose, District Judge.

Argued: April 18, 2012

Decided and Filed:  October 1, 2012

Before:  BATCHELDER, Chief Judge; GIBBONS and SUTTON, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Gary W. Crim, Dayton, Ohio, for Appellant.  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:** Gary W. Crim, Michael L. Monta, Dayton, Ohio, for Appellant.  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

    ALICE M. BATCHELDER, Chief Judge.  Fifteen years ago, petitioner Elwood Jones was on trial for his life, accused of the murder of Rhoda Nathan.  The Ohio jury convicted Jones and recommended the death penalty.  He is now before us to appeal the district court's denial of his petition for habeas relief, arguing that the State of Ohio violated his federal Due Process rights in several ways.  Specifically, he claims that the state trial court improperly admitted evidence that Jones exercised his right to counsel;

that the prosecution failed to disclose exculpatory and impeachment evidence, and Jones' counsel provided ineffective assistance by failing to discover the withheld evidence; and that his trial counsel provided ineffective assistance by failing to investigate a history of crime at the hotel where Nathan was murdered.  Because Jones's claims are without merit, we AFFIRM the district court's dismissal of his habeas corpus petition.

## I.

The Ohio Supreme Court establishes the following facts:

During the early afternoon of Friday, September 2, 1994, Elaine Schub and Joe Kaplan checked in as guests at the Embassy Suites Hotel in Blue Ash.  Schub was in town to see her grandson's bar mitzvah, which was to be held the following day.   Schub's best friend, Rhoda Nathan, flew in from New Jersey later that afternoon also to attend the event on Saturday.  Schub and Nathan shared the bedroom of the hotel suite, while Kaplan stayed in the front room using a foldout bed.

On Saturday morning, September 3, Schub and Kaplan awoke early to meet relatives at the complimentary breakfast served on the first floor of the hotel.  As she and Kaplan left the room at approximately 7:28 a.m., Schub told Nathan to go back to sleep, since she did not need to be at the temple that morning as early as the family.  Kaplan had the only room key for the group and made sure the door was locked when he and Schub left for breakfast.

At approximately 8:08 a.m., Schub and Kaplan finished breakfast and returned upstairs to their room.   Kaplan unlocked the door and discovered Nathan lying nude on the floor.  Employees and hotel guests rushed up to Room 237, where Schub was found screaming and shaking.  A cardiologist, a respiratory therapist, and a nurse happened to be at the hotel at the time, and they came to the room to help resuscitate Nathan.

Initially, witnesses thought Nathan had had a fall, perhaps brought on by a heart attack, since there seemed to be little blood on or around Nathan. However, further investigation revealed that Nathan's hair was soaked with blood and that she had suffered severe trauma to her head. When Nathan's head was moved, witnesses found a tooth on the floor.  Later, Schub asked for and was given her purse, which she had left in the hotel room during breakfast.  Upon opening her wallet, which was inside the purse, Schub noticed that money was missing.

During the commotion, Schub noticed that Nathan no longer had the pendant necklace that she had been wearing earlier and that she always wore. The pendant was a one-of-a-kind piece of jewelry that Nathan's late husband had made from his mother's wedding band. It consisted of several connected gold bars, one containing diamonds. According to Nathan's daughter-in-law, Nathan never took the pendant off. Nathan died that afternoon as a result of multiple traumas to her head and body. The coroner's office determined that the death was a homicide.

Police quickly set up a command center in a banquet room on the second floor near the murder scene in Room 237. Police canvassed the rooms at the hotel and took statements from guests and hotel employees working that day. Police then began to concentrate their investigation on three particular hotel employees who had prior criminal histories. Police cleared two of the employees through further investigation and narrowed their investigation to defendant-appellant, Elwood "Butch" Jones. Police discovered from interviews with other hotel employees that appellant had injured his hand on the day Nathan was killed. This fact pointed to appellant as a suspect because the crime at the hotel involved a violent assault. Appellant had filed a claim for workers' compensation for medical benefits. The police thereafter subpoenaed and received the medical records for the treatment of appellant's hand injury.

On September 12, 1994, Sgt. Robert Lilley of the Blue Ash Police Department spoke with one of appellant's treating physicians, Dr. John McDonough. Lilley learned through another police investigator that Dr. McDonough had classified appellant's injury as a fist-to-mouth injury and that Dr. McDonough had asked appellant if he received the injury by punching someone in the mouth. That same day, police went to the residence of Earlene Metcalfe in Loveland. Metcalfe worked at the hotel and was a girlfriend of appellant, in addition to being listed as a witness to appellant's hand injury on his workers' compensation claim form. Upon arriving at Metcalfe's residence, police found appellant there, and both he and Metcalfe voluntarily agreed to answer questions at the Blue Ash Police station concerning the homicide at the hotel.

At the police station, appellant was advised of his Miranda rights and signed a waiver form. During the interview with Sgt. Lilley and Blue Ash Police Officer Larry Stokes, appellant stated that he and Metcalfe arrived at the hotel on September 3 at approximately 5:00 a.m. At that time, appellant signed out a hotel master key at the front desk as he did every day at work. Since appellant was not due to clean the hotel banquet rooms until 10:00 a.m., he began to help Metcalfe set up the complimentary breakfast area. Shortly after 6:00 a.m., appellant learned that a coworker would not be in to work that morning, so he went to the second floor of the hotel to begin cleaning the banquet rooms. Appellant

stated that at around that time, he slipped on steps outside the hotel and fell, cutting his left hand while taking trash out to the hotel dumpster. He then finished cleaning the Maple banquet room and went downstairs to help with the hotel's complimentary breakfast.

According to Lilley, appellant was forceful and almost defensive when he claimed that he worked at the breakfast from approximately 6:30 a.m. to 8:00 a.m. that day. Appellant further claimed that he was cleaning tables in the restaurant dining area when he heard screams from the second floor as well as a trouble call over a coworker's employer-provided walkie-talkie.

Appellant told Lilley that he again hurt his hand in a banquet room later that day and that he really thought nothing more of the injury until it started bothering him several days later on September 6. Appellant reiterated that he never left the restaurant on September 3 between 6:30 and 8:00 a.m. and asserted that he was never inside Room 237, since he had no reason to be in any of the guest rooms at the hotel. Lilley asked if he was involved in the murder, and appellant declared that he wanted to talk to an attorney before he answered any more questions. At that point, the interview ceased.

The police secured Metcalfe's consent to search her residence and also obtained a warrant to search a vehicle owned by appellant, which was parked in Metcalfe's driveway in Loveland. In addition, police obtained a search warrant for appellant's residence on Morman Avenue in Cincinnati. While police seized many items of apparel from the two residences, none of them yielded any trace evidence of blood. However, the search of appellant's car produced several items of evidence. Inside the toolbox in the trunk of appellant's car was the unique pendant belonging to Nathan. Also recovered from the toolbox was a master key to the hotel, which could open Room 237, where the murder took place. Police also recovered door security chains, which were later used in attempting to match marks on Nathan's body found on autopsy photos.

The last test results on the seized items came back in August 1995, and the case was later submitted to the grand jury. On September 27, 1995, the grand jury indicted appellant on two counts of aggravated felony-murder (during an aggravated burglary and during an aggravated robbery), and separate counts of aggravated burglary and aggravated robbery. Death-penalty specifications attached to each aggravated murder count alleged that appellant was the principal offender in the aggravated murder during a burglary and the principal offender in the aggravated murder during a robbery or committed the offenses with prior calculation and design. Ultimately the prosecution proceeded only on the first alternative, that appellant was the principal offender. R.C.

2929.04(A)(7). Police arrested appellant at his place of employment in downtown Cincinnati later that day and took him to the District 1 police station for processing.

While at the District 1 headquarters, appellant was shown a copy of the indictment and told he was under arrest for the murder of Rhoda Nathan, as well as for burglary and the robbery involving her pendant necklace. At that point, appellant inquired, "What necklace?" Sgt. Lilley then produced a photo sheet of the pendant recovered from appellant's car and placed it on the table. Appellant then stated that he had never seen it before in his life. Sgt. Lilley told appellant that the pendant had been recovered from the trunk of his car. Appellant declared, "Not in my fucking car."

A jury trial was held wherein numerous witnesses were called by both the prosecution and defense. Among the prosecution witnesses was Dr. John McDonough, who was appellant's physician during his hand surgery. Dr. McDonough testified that he took a culture from the wound in appellant's left hand and that testing indicated a "mixed flora" of organisms. One of the organisms detected was *eikenella corrodens*, an organism usually found in dental plaque, which Dr. McDonough described as extremely rare in hand injuries. Dr. McDonough testified that, within a reasonable degree of medical certainty, the infection to appellant's hand was caused by a fist-to-mouth injury because of the presence of *eikenella corrodens*. This type of injury is sometimes referred to as a "fight bite." The defense put into evidence the testimony of an expert, Dr. Joseph Solomkin, who questioned the likelihood of Dr. McDonough's conclusion. Dr. Solomkin testified that it was possible that the *eikenella corrodens* had come from some source other than an assault victim's mouth.

After deliberation, the jury found appellant guilty as charged.

*State v. Jones*, 739 N.E.2d 300, 305–07 (Ohio 2000). The jury convicted Jones on two counts of aggravated felony murder, one count of aggravated burglary, and one count of aggravated robbery, and recommended the death penalty. *Id.* at 307–08. The Ohio Court of Appeals and the Ohio Supreme Court affirmed the convictions and the death sentence. *Id.* at 308, 320.

After failing to overturn his conviction on direct appeal, Jones has wended his way through the collateral attack process, first in state court and now here in federal court. Jones filed a state petition for post-conviction relief and an application to reopen,

both of which were denied. *State v. Jones*, No. C-990813, 2000 WL 1886307 (Ohio Ct. App. Dec. 29, 2000); *State v. Jones*, 745 N.E.2d 421, 422 (Ohio 2001). Then, in 2001, Jones filed a habeas petition in federal district court raising fourteen counts for relief; the district court adopted the magistrate judge's report and recommendation and rejected all of Jones's claims on the merits. *Jones v. Bagley*, No. C-1:01-cv-564, 2010 WL 654287, at *12–87 (S.D. Ohio Feb. 19, 2010). The district court granted Jones a certificate of appealability ("COA") on three issues and we denied Jones's motion to expand the COA further. Jones filed a timely appeal.

## II.

Now that he's before us, Jones raises those three issues: whether the state trial court improperly admitted evidence that Jones exercised his right to counsel; whether the prosecution failed to disclose exculpatory and impeachment evidence, and whether Jones' counsel provided ineffective assistance by failing to discover the withheld evidence; and whether his trial counsel provided ineffective assistance by failing to investigate a history of crime at the hotel where Nathan was murdered. As we do in a direct criminal appeal, we review de novo a district court's legal conclusions and mixed questions of law and fact, and review its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). But unlike on a direct appeal from a criminal conviction, we consider Jones's petition in light of the Antiterrorism and Effective Death Penalty Act ("AEDPA") and the Supreme Court opinions interpreting it.[1] AEDPA represents Congress's desire to "'channel prisoners' claims first to the state courts." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011). And because "[t]he federal habeas scheme leaves primary responsibility with the state courts," *id.* (quoting *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002)), under AEDPA a federal court may not grant a habeas corpus petition unless the state court decision

---

[1] Courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision, *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003), but consider lower-federal-court decisions to the extent they shed light on Supreme Court holdings. *See Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  By its own terms, § 2254(d) only applies to those claims "adjudicated on the merits in State court proceedings." *Id.*

When applicable, § 2254(d) establishes a standard of review that is "difficult to meet, . . . [a] highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 131 S. Ct. at 1398; *see also Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012) ("Section 2254(d), as amended by AEDPA, is a 'purposefully demanding standard.'" (citation omitted)).  Accordingly, "[t]o obtain relief, a *habeas* petitioner must 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Campbell*, 674 F.3d at 586 (quoting *Harrington v Richter*, 131 S.Ct. 770, 786-87 (2011)).  Thus, under the "contrary to" clause of § 2254(d)(1), we may grant habeas relief "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts," *see Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring), and review of such issues must be based solely on "the [factual] record that was before the state court." *Pinholster*, 131 S. Ct. at 1398. Similarly, we may grant habeas relief under the "unreasonable application" clause of § 2254(d)(1) only if the state court's application of clearly established federal law was "objectively unreasonable" in light of the evidence presented to the state court, keeping in mind that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (O'Connor, J., concurring); *see also Wood v. Allen*, 130 S. Ct. 841, 849 (2010) ("[A] state-court factual determination

is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

Of course, there are times when § 2254(d) does not apply, most notably when the petitioner presents an argument to us that was not presented to the state courts. In most such cases our analysis is even further restricted; "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted. *Id.* at 847–48; *see Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (noting that "the exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review"). The petitioner will therefore not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims and actual prejudice to his defense at trial or on appeal. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). An ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), is cognizable to show "cause and prejudice" for procedural default and—along with a claim under *Brady v. Maryland*, 373 U.S. 83 (1963)—is the legal theory most commonly used to attempt to circumvent the procedural default rule. A petitioner may also obtain review of his claim if review would prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 495–96 (1986). If a petitioner demonstrates cause and prejudice for procedural default, we provide de novo review of the legal issue. *See, e.g.*, *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006). But, regardless of the standard of review for legal issues, the state court's factual findings are presumed correct unless rebutted by the habeas petitioner by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004). With these principles in mind, we turn to our analysis.

## III.

### A.

Jones first argues that the state trial judge improperly allowed the prosecutor to elicit evidence that Jones exercised his right to counsel during a police interrogation—a violation of his Fourteenth Amendment Due Process rights. We agree with the state courts that the trial judge improperly allowed the prosecutor to elicit testimony that Jones had exercised his right to counsel, but we also agree that because the trial judge gave several instructions to the jurors that they were not to treat this as evidence of Jones's guilt, the error was harmless and therefore not a violation of his Due Process rights.

During one of Jones's three interrogations by the police he said that he would need to "talk to an attorney before he answered any more questions." At the time he exercised his right to counsel, Jones was being questioned at the police station and had been read *Miranda* rights, but was not under arrest. Over the objections of defense counsel, the trial court allowed prosecutors to elicit from the police witness the fact that the interrogation ended when Jones asked to speak with an attorney. The trial court then told the jury that "anybody . . . had the right to invoke their right to counsel," and that they were permitted to hear the testimony only "so that you understand what happened during the course of the interview." The trial court later reiterated this instruction to the jury at the guilt phase of the trial, stating that "[Jones] has a constitutional right to stop talking to the police and request counsel at any time. . . . [And] [t]he fact that he stopped talking to the police and invoked his right to counsel must not be considered for any purpose." The district court also admitted into evidence the police witness's interview report, which documented that Jones requested to speak to an attorney at the end of the interview.

Every court that has reviewed the error, including the Ohio Court of Appeals, the Ohio Supreme Court, and the district court, has held that it was improper for the trial

court to allow the prosecutor to elicit this testimony.**2** We hold that this is not an unreasonable application of federal law. "[I]t is 'fundamentally unfair' to allow a prosecutor to use a defendant's post-*Miranda* warnings silence to impeach an explanation he offers at trial." *Jaradat v. Williams*, 591 F.3d 863, 867-68 (6th Cir. 2010) (holding that where the court allowed the prosecutor to elicit that the defendant had invoked his right to counsel after being given *Miranda* warnings, the prosecutor's "questions amount[ed] to blatant *Doyle* violations" (citing *Doyle v. Ohio*, 426 U.S. 610, 619 (1976))). But as the district court and the Ohio courts held, this violation was harmless error given that the trial judge gave curative instructions and the evidence against Jones was otherwise strong. *See id.* at 869 (noting that an error is harmless unless it "had substantial or injurious effect or influence in determining the jury's verdict"); *Goff v. Bagley*, 601 F.3d 445, 480–81 (6th Cir. 2010) (holding that the court "presume[s] the jury followed" the curative instructions, particularly where "the remarks were isolated, and there was substantial evidence before the jury favoring a death sentence"). The jurors were clearly instructed before deliberating that they were not to take this evidence into consideration, and the fact that Nathan's locket was found in Jones's possession was strong evidence of his guilt.

We review a state court's "harmless error" analysis under the *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993), "substantial and injurious effect standard." *See Jaradat*, 591 F.3d at 869. Under that standard, the state court did not err at all.**3** Therefore, Jones's Due Process rights were not violated under *Doyle*.

---

**2***See Jones*, 2010 WL 654287, at *16; *Jones*, 739 N.E.2d at 313; *State v. Jones*, No. C-970043, 1998 WL 542713, at *7–8 (Ohio Ct. App. Aug. 28, 1998).

**3**The State presented several arguments that there was no *Doyle* violation; we decline to discuss most of them given that Jones was not prejudiced in any event. One legal theory, however, we cannot ignore. During oral argument, counsel for the State expressed his view that 28 U.S.C. § 2254(a), which grants to the federal courts the authority to entertain applications for habeas relief only "on the ground that [the applicant] is in custody in violation of the Constitution or laws or treaties of the United States," should be interpreted to mean that we lack authority to enforce a party's waiver or forfeiture of a challenge to a state court decision on a constitutional issue—essentially that we should conduct a de novo review of a previously conceded constitutional issue because we have a steadfast responsibility to interpret the Constitution, no matter whether the issue has been forfeited (or waived) or not. On de novo review, said counsel, we would be able to hold that there was no *Doyle* violation. The following exchange ensued:
Judge: "[W]e have this duty to decide then whether there was a constitutional violation, despite the concession there was not?"
Counsel: "I believe the answer to that question as far as I'm concerned , Your Honor, is yes . . . ."

**B.**

Jones next argues that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding four pieces of evidence: (1) police reports reflecting criminal acts and suspicious employees at the Embassy Suites; (2) inconsistent descriptions of Nathan's pendant; (3) contemporary complaints from Embassy Suites guests about intruders in the hotel; and (4) witness statements that contradicted trial testimony. Jones presented the first claim to the Ohio courts, which rejected it on the merits, *see Jones*, 2000 WL 1886307, at *3–4; he did not present the last three claims to the Ohio courts, but argues that there is cause and prejudice under *Brady* to excuse the procedural default.[4] His *Brady* claims are meritless.

In order to show a *Brady* violation, Jones must show that (1) the evidence was favorable to him, (2) the prosecutor withheld the evidence, and (3) he suffered prejudice, which means that the suppressed evidence is material either to his conviction or his sentence. *See, e.g.*, *Strickler v. Green*, 527 U.S. 263, 280–82 (1999). Favorable evidence is material if there is a reasonable probability that, had the fact-finder considered it, the result of the trial would have been different. *Id.* at 280. The Ohio Court of Appeals and the district court rejected Jones's first claim—that the prosecutor withheld crime reports that showed that the Embassy Suites had a higher incidence of crime than other Blue Ash hotels—because Jones had not demonstrated that this evidence was either "exculpatory or material." *Jones*, 2000 WL 1886307, at *4; *see also*

---

Judge: ". . . What's the case that, if I read it, will say, either the State or the habeas petitioner cannot waive or forfeit whether there was a constitutional violation?"
Counsel: "I don't have one, Your Honor."
When pressed, counsel was unable to provide a citation for this astonishing legal theory, and for good reason: there is none. When asked whether the State would embrace this novel legal theory if it were proffered by a habeas petitioner, counsel affirmed that it would. We doubt that, inasmuch as from the habeas petitioner's perspective, such a rule would be a veritable philosopher's stone, vivifying hopeless cases. We have serious skepticism about this legal theory. *See Akins v. Easterling*, 648 F.3d 380, 396–97 (6th Cir. 2011) (enforcing waiver against § 2254 petitioner).

   [4]According to Jones, the factual predicates for *Brady* claims two through four were only disclosed to him during discovery at his federal habeas proceedings. If Jones were able to show a *Brady* violation, introduction of new evidence not considered by the state court would not violate the rule announced by the Court in *Cullen v. Pinholster*. There, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that *adjudicated the claim on the merits*." 131 S. Ct. at 1398 (emphasis added). These three claims were not adjudicated on the merits, purportedly because the prosecutor withheld the evidence on which the claims would be based, so *Cullen* is not directly implicated.

*Jones*, 2010 WL 654287, at \*43–45. We agree. Jones argued to the state court that the crime reports would have helped his innocence case by demonstrating:

> (1) that the Embassy Suites Hotel routinely hired criminals; (2) that the hotel's guests were routinely crime victims; (3) that the hotel rooms were routinely used by "unsavory characters," and (4) that several thefts had occurred at the hotel after Jones was no longer present, including an incident in which someone tried to enter a guest's room with a key.

*Jones*, 2000 WL 1886307, at \*4. Even if true, none of this exculpates Jones because at most it proves that the Embassy Suites has more crime than other hotels, not that someone other than Jones was responsible for Nathan's murder; there is simply no reasonable probability that had this evidence been disclosed to Jones, the result of the trial would have been different. The Ohio court's finding that this evidence was not material was neither contrary to nor an unreasonable application of federal law.

Because Jones did not raise his remaining *Brady* claims to the state courts, he must demonstrate cause and prejudice for his procedural default, although showing an actual *Brady* violation is itself sufficient to show cause and prejudice. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 691 (2004). We review these *Brady* claims under the pre-AEDPA standard—that is, we apply de novo review—because they were never considered by the state courts. *See, e.g.*, *Joseph*, 469 F.3d at 469. Jones first claims that the prosecutor should have divulged that witnesses had been inconsistent in describing the exact shape and origin of Nathan's pendant; had he known this fact, Jones says, he could have created reasonable doubt that the pendant found in his toolbox was Nathan's. This is a serious accusation because the pendant is the key piece of evidence in the case—the prosecution was able to convince the jury that the pendant found in Jones's toolbox was unique and that it was Nathan's—and Jones might well have escaped conviction had serious doubts been raised as to its authenticity. It is true that the pendant was initially described from memory differently by different people, and even that police documents misdescribed the pendant. It is also true that Nathan's family members had

conflicting memories as to the origin of the pendant, with some saying that it had been fashioned from a family heirloom and others disagreeing.**5**

The evidence was favorable to Jones, and the prosecution withheld it, but after carefully examining the withheld evidence we do not think that its absence prejudiced him. First, Jones's counsel was aware, at trial, that the police report misdescribed the pendant, and so Jones was on notice that there was some initial confusion as to its appearance. "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008) (holding that where defense counsel knew of the withheld evidence it "cannot form the basis of a *Brady* violation"). Second, despite some initial confusion about the pendant, Jones does not deny, or even address, the fact that when family members and friends compared the pendant found in his toolbox with family pictures in which Nathan is wearing her pendant, they concluded that the pendants were one and the same. *See Jones*, 2010 WL 654287, at *47–48 (noting that the photographs with Nathan wearing the pendant had been given to defense counsel at trial). The photograph and the pendant were both admitted into evidence. *Id.* at *47. Jones's counsel was unable to explain the fact that the pendant in Jones's toolbox appeared to be identical to the pendant worn by Nathan in family photos.

At best, Jones argues that if he had known of the contradictory evidence he would have investigated further whether the pendant was in fact one-of-a-kind or whether it was mass-produced. But he had every motivation to establish this fact even without the withheld evidence: he was able to inspect the pendant; he had photos of the pendant; his counsel knew, at trial, of the misdescription of the pendant in the search

---

**5**The search warrant affidavit described the pendant as being "silver in color, having seven rows of horizontal tubular metal and also having three diamonds" when in actuality the pendant was gold with fewer bars. Nathan's son described the pendant as silver with three offset bars and believed that it had been custom-made for his mother from his paternal grandmother's wedding ring, but his uncle disputed the pendant's origins, claiming that he still possessed the wedding ring. In addition, police interviewed the jeweler where the pendant may have originated, and he was not able to confirm whether it was custom-made or mass-produced.

warrant and knew that the misdescription originated from Nathan's family. *See id.* Even so, Jones was not able to introduce any evidence that the pendant was mass-produced, or even that there is a single other one of its kind; indeed, the very difficulty that family members and friends had in describing the pendant may show its uniqueness. In light of these facts, Jones would not have been able to create a reasonable doubt in the minds of the jury about the provenance of the pendant had he known of the withheld evidence.

Jones's third *Brady* claim is that the prosecutors should have told him that the police received reports from Embassy Suite patrons about "suspicious" activities on the day of Nathan's murder because the defense could have followed up with these witnesses and might have been able to convince the jury that there was a gang operating in the hotel that day. *Jones*, 2010 WL 654287, at *48. The police had distributed a questionnaire to hotel patrons requesting them to report any suspicious activities. The district court noted that the responses ranged from "telephones being out of order, [a] breach of security protocol, many people reporting that they heard screams, maintenance people trying to gain access without properly identifying themselves, and a man that seemed 'out of place.'" *Id.* None of this evidence suggests that a gang was working in the hotel, and even when considered as a whole, the withheld evidence is insufficient to undermine confidence in the result of the case; there was neither harm nor prejudice in this *Brady* claim.

Jones's last *Brady* claim is that the prosecutor should have disclosed two hotel employees' statements that Jones asserts are inconsistent with trial testimony and a statement by a hotel patron that she saw a tall, thin man leaving the hotel parking lot around the time of the murder. The two hotel employees testified to seeing a black hotel employee talking with a white person outside of Nathan's room soon after her body was discovered and that this black person was not Jones. Jones argues that if his defense attorneys had known about this evidence they could have tracked down these three witnesses and questioned them further. None of these statements are even favorable to Jones, much less exculpatory, and indeed, the district court found that other testimony

provided by one of the hotel employees was actually inculpatory for Jones.**6**   *Jones*, 2010 WL 654287, at *49.  There was no *Brady* violation here.

Within this claim Jones also argues that the prosecutor should have turned over the list of Embassy Suites employees and their criminal backgrounds, as well as the polygraph results of some of these employees who agreed to interrogation.  But Jones does not explain how this would have helped his case other than that "[t]his compilation would have assisted counsel."  This evidence is neither exculpatory nor impeaching, and Jones suffered no prejudice because of its absence.**7**

Even when the cumulative effect of Jones's *Brady* claims is considered, there was no *Brady* violation because the effect of all the evidence combined would not have created a reasonable probability of a different result when we consider the otherwise strong circumstantial evidence of his guilt.  *See Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995).  Jones had a pass-key with which he could access Nathan's room; he was working the day of the murder; his hand-injury contained bacteria usually found only in the human mouth, his hand was injured the same day as Nathan's attack, and Nathan was struck in the mouth immediately prior to her death; and Nathan's missing pendant was recovered from Jones's possession.  This evidence, while not overwhelming, is strong and more than sufficient to support conviction.

---

**6**The district court noted that Demetrius Williams, one of the hotel employees, asserted that Jones only spent five minutes setting up the complementary breakfast that day, which contradicts Jones's statement that he spent from 6:30 a.m. to 8:00 a.m.—a time-span that included Nathan's murder—attending to the breakfast.  *See Jones*, 2010 WL 654287, at *3, *49; *see also Jones*, 739 N.E.2d at 306–07.

**7**Although part of this certified question is whether Jones's trial counsel provided ineffective assistance by not discovering this *Brady* material, Jones does not advance this argument in his appeal brief as to claims two through four, and so this argument is waived for those claims.  *See, e.g.*, *Henness v. Bagley*, 644 F.3d 308, 326 n.4 (6th Cir, 2011).  And since Jones was not prejudiced by any of his asserted *Brady* violations, he would not have been able to establish ineffective assistance of counsel under *Strickland*.

## C.

Jones does, however, separately argue that his trial attorneys provided ineffective assistance of counsel with regard to the substance of his first *Brady* claim—that prosecutors should have turned over evidence that the Embassy Suites had a higher incidence of crime than other Blue Ash hotels. Jones made this argument to the Ohio courts and the district court, so it is not procedurally defaulted, but because the Ohio courts considered the issue we must apply AEDPA review. The Ohio Court of Appeals noted that it had already decided that the underlying *Brady* claim was without merit, and accordingly there was no credible argument for ineffective assistance of counsel regarding that claim. *Jones*, 2000 WL 1886307, at *7. The district court agreed with this analysis. *Jones*, 2010 WL 654287, at *58.

Under *Strickland v. Washington*, Jones must show that (1) his trial counsel was so deficient that he was not performing his basic function under the Sixth Amendment and (2) that this ineffective assistance was so prejudicial that "a reasonable probability exists that, but for counsel's deficient performance, the result of the proceedings would have been different." *Tibbetts v. Bradshaw*, 633 F.3d 436, 442 (6th Cir. 2011). We must also bear in mind that "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations omitted). We need not decide whether Jones's trial counsel rendered constitutionally deficient representation by not investigating the history of crime at the Embassy Suites, because this representation did not prejudice Jones's trial.[8] As we noted in our analysis of the related *Brady* claim, evidence that the Embassy Suites was subject to a higher crime rate than other Blue Ash hotels would not have made any difference to the outcome of the case considering the otherwise strong evidence of guilt. Jones certainly did not suffer prejudice because his attorney failed to investigate and uncover the crime rate at the Embassy Suites.

---

[8]Because a petitioner must show both *Strickland* prongs in order to gain relief, if the prejudice prong demonstrates that the petitioner is not entitled to relief we need not analyze the competence prong. *See Baze v. Parker*, 371 F.3d 310, 321 (6th Cir. 2004) (citing *Strickland*, 466 U.S. at 697).

Finally, Jones argues that the Ohio Court of Appeals used the wrong standard to evaluate this *Strickland* claim and its judgment thus involved an unreasonable application of Supreme Court precedent under the AEDPA standard.  The Ohio Court of Appeals did appear to cite a "fundamentally unfair" standard for the prejudice prong, which the Supreme Court in *Williams* stated was an unreasonable application of its precedent.  *See* 529 U.S. at 391–94 (holding that to establish prejudice the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  But the error was harmless.  First, because the Ohio Court of Appeals cited an Ohio Supreme Court case for this assertion that itself correctly cited *Strickland*, it is not clear that the court of appeals intended to state the incorrect standard.  *See Jones*, 2000 WL 1886307, at \*7 (citing *State v. Combs*, 652 N.E.2d 205, 211-12 (Ohio 1995)).  Second, even if the court of appeals used the wrong standard, this simply means that Jones is entitled to de novo review of his substantive *Strickland* claim, and, after de novo review, we hold that Jones was not prejudiced by his attorney's failure to investigate the incidence of crime at the Embassy Suites.

**IV.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.