NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0792n.06

Nos. 13-1262/1273

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 20, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DENNIS VESEY, | ) | |
| | ) | |
| Petitioners-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| GREG MCQUIGGIN, | ) | |
| | ) | |
| Respondent-Appellee, | ) | OPINION |
| | ) | |
| AND | ) | |
| | ) | |
| DAMEKO VESEY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEBRA SCUTT, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE:  KEITH, BATCHELDER, and STRANCH, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.**  In this habeas appeal, Petitioners Dameko Dwayne Vesey and Dennis Wayne Vesey challenge their convictions of first-degree felony murder, conspiracy to commit armed robbery, and conspiracy to commit first-degree home invasion.  The sole issue on appeal is whether the state court denied Petitioners their constitutional right to present a complete defense in excluding evidence tending to establish third-party guilt.  The

district court denied Petitioners' writ of habeas corpus. Because we cannot conclude that any errors in the state court ruling rise to the level required by 28 U.S.C. § 2254, we **AFFIRM**.

I.

On April 5, 2003, at the Harris Park Apartments located on South Harris Road in Ypsilanti, Michigan, Taurus Hill, his girlfriend Tayquelea Roberson, and their infant son, Taurus Hill, Jr., were murdered. Hill and Roberson were shot to death; a wounded Hill fell on top of Hill Jr., suffocating him to death.

Petitioners Dameko and Dennis Vesey were charged with the murders and tried jointly. Petitioners' cousin, Michael McGaha, was a co-defendant but was acquitted on all counts by a separate jury. Both Petitioners were found guilty of three counts of first-degree felony murder, conspiracy to commit armed robbery, and conspiracy to commit first-degree home invasion. Dennis Vesey was also found guilty of felon in possession of a firearm and felony firearm. Dennis Vesey was sentenced to mandatory life without parole on each of the first-degree murder convictions, 20 to 30 years for conspiracy to commit armed robbery and conspiracy to commit home invasion, 40 to 90 months for felon in possession of a firearm and two years for felony firearm. Dameko Vesey was sentenced to life in prison without parole on each of the felony murder convictions, 15 to 30 years imprisonment on the conspiracy to commit armed robbery conviction and 13 to 20 years on the conspiracy to commit first-degree home invasion conviction. The following facts underlie these convictions.

*Tyranique Hill*

Three other minor children were in the home at the time of the murders: Hill's daughter, nine-year-old Tyranique Hill; Roberson's daughter, Dakaisia Roberson; and Roberson's niece,

Jasmine Harris. Tyranique testified during trial that, on the night of the murders, she, Dakaisia, and Jasmine were in the living room watching television when a man, whom she had never seen before, came to visit her father. The man had a conversation with Hill at the kitchen table.

Shortly after the first man left, an unidentified man knocked on the door. Some period of time thereafter, there was a third knock on the door. Hill looked out the window, indicated that he knew one of the visitors, and opened the door. Per Tyranique, two males entered the apartment; one was standing by the door and the other was fighting with Hill. Tyranique testified that the man fighting with Hill was wearing a mask. The three children fled the living room into bedrooms. From the bedroom, Tyranique heard multiple gunshots. She then peered into the other room and witnessed one of the assailants—described as the "skinny one"—pointing a gun at Roberson.

Tyranique testified that after hearing the gunshots she heard footsteps walking towards the room in which Roberson and Hill, Jr. were located. She heard Roberson "swearing to God on her life . . . [t]hat there wasn't any money." Tyranique stated that she recognized one of the voices in the room in which Roberson was present as belonging to the first man who visited her father that night. She then heard a gunshot from the same room. Sequentially, Tyranique heard footsteps move towards the kitchen, running water, and then the door close. After the men left, Tyranique, Dakaisia and Jasmine fled the apartment. Tyranique told a detective at the police station that morning that she saw two cars—one described as white and "long like her dad's car" and the second, "cute, a nice car," playing loud rap music—leave the adjacent trailer park and come into her parking lot.

A year after the murders, Tyranique, when presented a photo array, identified Dameko Vesey as the first man who came to the door that night and sat at the kitchen table with her father. At trial, Tyranique identified co-defendant Michael McGaha as the man who sat with Hill at the table. When interviewed by police, Dakaisia and Jasmine provided similar details about the entry of the masked men.

*Nerissa Pittman*

The state called Nerissa Pittman as its primary witness in the case. Pittman was originally charged as an accomplice, and eventually pleaded guilty to second-degree murder and agreed to testify against the defendants. Pittman also lived in the Harris Park Apartments in April, 2003. Pittman testified that she knew Hill: twice, she engaged in sexual relations with him at a hotel. During one such encounter, Hill told Pittman to count some of his money for him, which she did. Pittman testified that she then told Darius Frazier, another neighbor, that "someone has some money and they don't know what to do with it." She averred that she did not say Hill's name nor could she remember if she indicated to Frazier that it was Hill to whom she was referring.

A few days later, Pittman, Frazier, and Dennis Vesey congregated in Frazier's mother's apartment, where Pittman observed guns in Frazier's bedroom. Pittman testified that she saw Frazier hand two guns to Dennis Vesey, Frazier's cousin. Dennis Vesey then left the apartment with the firearms. Pittman later saw Dennis Vesey in a champagne-colored SUV.

Pittman testified that, on the night of April 4, 2003, she called Dennis Vesey to secure marijuana. After arranging the transaction, she went to Dennis Vesey's SUV, which she again described as champagne-colored. Pittman testified that Dameko Vesey and McGaha were in the

4

car with Dennis Vesey. Dennis asked Pittman to knock on Roberson and Hill's door for him, while Dennis Vesey and McGaha waited nearby with firearms. Pittman stated that when she knocked on the door, Hill answered and the Veseys and McGaha rushed the door, gaining access to the apartment.

Pittman ventured to the back of the apartment where she retrieved an unidentified amount of ecstasy. While inside, she witnessed McGaha pointing a gun at Roberson; Roberson responded that "this is all we have." Pittman then testified that she heard two gunshots from the front room and saw Hill lying on the floor. After she left the apartment, she heard two more gunshots.

Pittman testified that the Veseys and McGaha were not wearing masks the night of the murders. Officers interviewed Pittman twice after the murders and she lied to them both times because she was "afraid of telling the truth at that time" and "didn't want to have nothing to do with it." Pittman also lied to the prosecutor when first questioned incident to a subpoena. Pittman recanted after she was incarcerated.

*Joyce Jordan*

Joyce Jordan, also a resident at the apartment complex, testified that on the evening of April 4, 2003, she saw Hill, Roberson, and Dennis Vesey, whom she also knows as "Juan," arguing outside her window. Joyce observed Dennis Vesey go to his truck, which she described as a silver Envoy or Yukon, reach under the seat, and grab a firearm. Joyce testified that she saw one or two other passengers in the SUV, one of whom she believed to be Dameko Vesey. At this point, Dennis, Dameko, and another passenger stood for a minute until Pittman walked past. Pittman proceeded toward the back of the building; the Veseys followed her. Joyce testified that

minutes after she lost sight of the men, she heard a gunshot. She then saw the silver SUV and a brownish-colored car with a light tan stripe pull out of the parking lot.

Joyce testified that she had taken four shots of tequila that night. Joyce did not call 911 because it was "none of my business. I live there I didn't care." Joyce also admitted that when the police officers first contacted her, she lied because she "wanted nothing to do" with the case. On cross examination at trial, Joyce stated "I still haven't said a lot of things that I know. It's none of your business."[1]

Joyce said she did not remember being shown a photo array that next morning. Joyce testified that Detective Ralph did show her pictures when she arrived at the station on the evening of April 6, 2003. Detective Ralph testified that Joyce identified the photographs of three men as those she saw outside her apartment: Swanson, Byers, and Ricardo Pickens aka "Duan Mason." As for her identification of the Veseys, at trial, Joyce was shown a transcript of her testimony from the preliminary examination, which reflected that she testified that she picked out "Juan's" photograph the morning of the shooting. Joyce admitted that, to her recollection, she never picked out Dameko Vesey in any of the photos or gave a physical description of the passenger who was with "Juan."

*Tanet Jordan*

Tanet Jordan, Joyce's daughter and also a resident of the apartment complex, testified that on the night of April 4, 2003, she heard Pittman and multiple unidentified men arguing in the apartment complex. She then observed Dennis Vesey—whom she knows as "Juan"—drive

---

[1] Joyce also had a phone call with the prosecutor during which she stated, "you guys don't know the half of it. You think you got everyone that was there but you don't. You got what you want. You got Nerissa. You got them other guys but you didn't get them all." At trial, Joyce maintained that she has "always said that." Per Joyce, there were other people around the night of the incident but she did not know if they were involved or not.

his tan or silver SUV into the complex and congregate with various people. Dennis Vesey began arguing with Hill, although Tanet stated that she could not hear the contents of the exchange. She then observed Hill return to his own apartment. Thereafter, she witnessed Dennis Vesey and Pittman conversing near the back of the building. Ten minutes later, Tanet heard gunshots, at which point she observed Pittman flee the scene into a separate apartment.

During the investigation, Tanet was also called to a photo array, where she identified photos of Antone Swanson and Tomicko Byers as present at the scene just prior to the shooting. Tanet testified that she could not remember if "Juan's" photograph was amongst those provided in the photo array. She also stated that while she did tell one of the detectives that she saw two men run past her window that night, she did not know the identity of those individuals.

At trial, Tanet also testified that, earlier that night, she saw a man by the name of Maurice Robinson[2] talking to "Juan" near the time of the shooting. She had plans to meet Robinson for breakfast that morning, but he called her at 6:00 a.m., before the police arrived, to cancel. However, the rest of Tanet's proposed testimony regarding Robinson was excluded. According to Tanet, during this phone call, Robinson indicated to her that he had knowledge of the crimes and that he spent the night riding around with "Juan." Robinson denied making the statement out of the presence of the jury and denied even knowing Tanet. Because of the denial, Petitioners' counsel requested that Tanet be allowed to testify to the alleged statements from Robinson for impeachment purposes. The trial court denied this request, concluding that Tanet's testimony would be inadmissible hearsay. The district court denied habeas relief as to this

---

[2] Petitioner disputes whether the proper Maurice Robinson was secured at trial. Petitioner's concern, raised in the context of an ineffective-assistance-of-counsel claim, was denied on direct appeal and on federal habeas review. This issue was not certified for appeal to this Court.

evidence on the basis that Robinson's statement "did not exculpate Petitioner [Dameko Vesey] or the other defendants, did not necessarily inculpate Robinson in the murders, and potentially inculpated Dennis Vesey given the trial testimony that he was also known as 'Juan.'"

*Tiffany Juneau*

Other excluded testimony comes from Tiffany Juneau. On April 15, 2003, Juneau spoke to Antone Swanson while they were both in the Washtenaw County Jail. Per Juneau, Swanson told her that he chauffeured the murderers to the scene and back, although he refused to provide names. Juneau then relayed this information to Washtenaw County detectives in a letter. Petitioners contended that the third-party culpability exception for hearsay applied to the statements allegedly made by Swanson to Juneau. The trial court arranged for Juneau to be transported from Louisiana to Michigan to testify as to the contents of her letter. Swanson was brought to court and testified outside of the presence of the jury; he denied both making the statement to Juneau or even knowing Juneau.

The defense contended that the statements should be admitted "because the defense is third party culpability and the inference the jury could draw is that others had the motive and opportunity and, in fact, even made admissions to involvement. And, therefore, makes the defense theory more likely true. It becomes . . . an issue of simple relevance." The trial court rejected this argument, concluding that Juneau's proposed testimony was inadmissible hearsay. The Michigan Court of Appeals affirmed the exclusion of this testimony, concluding that as the statement was made to a jail inmate and it did not involve a statement to police, it did not serve to inculpate Swanson or exculpate defendants. Per the court, "[t]he vague statement does not, in any manner, exculpate defendants as it neither confirms nor denies their involvement in the

crimes. Further, there is no corroboration regarding the existence or content of the alleged statement to Juneau given Swanson's absolute denial that it occurred." *People v. Vesey*, 266617, 2008 WL 723918 at *8 (Mich. Ct. App. Mar. 18, 2008). The district court also denied habeas relief as to Juneau's testimony, concluding that the Michigan Court of Appeals' decision was neither contrary to Supreme Court precedent nor an unreasonable application thereof.

## II.

We review the District Court's decision to deny the writ of habeas corpus *de novo*. *Ruimveld v. Burkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Because Petitioners appeal from a state court proceeding, their petitions are subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the "Supreme Court opinions interpreting it." *Jones v. Bagley*, 696 F.3d 475, 482 (6th Cir. 2012). The AEDPA standard is "highly deferential." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

The deferential standard is formidable. Under the AEDPA, we may not grant a *habeas* petition unless the last reasoned state court decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *O'Neal v. Bagley*, 743 F.3d 1010, 1020 (6th Cir. 2013).

A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth by the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision will also be contrary to clearly established federal law if the state court confronts a set of facts that are materially

9

indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from that decision. *Id.* at 406. Such a decision unreasonably applies federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Id.* at 407-08. A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409. To obtain relief, "a habeas petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Jones*, 696 F.3d at 483 (internal quotations and citations omitted).

III.

Petitioners claim that the decision of the trial court to exclude third-party culpability evidence from Tiffany Juneau (testifying as to Antone Swanson's statements) and Tanet Jordan (testifying as to Maurice Robinson's statements) deprived them of their constitutional right to present a complete defense. According to Petitioners, the decision of the Michigan Court of Appeals to affirm the exclusion of the evidence on hearsay grounds and as bereft of reliability was an unreasonable application of, and was contrary to, clearly established federal law. We disagree.

The right to present a meaningful and complete criminal defense is a well-established and fundamental element of due process. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19-20 (1967). Of course, this right is not absolute. In presenting a defense, the defendant "must

10

comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. at 302. Generally, the defendant may not offer testimony that is "otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Nevertheless, and, as relevant here, the Supreme Court has held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302.

A defendant may circumvent a state hearsay rule when certain necessary predicate circumstances—such as those articulated in *Chambers*—are present. The Court held that where the contested testimony was "critical" to the defense, where the testimony "bore persuasive assurance of trustworthiness," and where the testimony *directly* affected the ascertainment of the defendant's guilt, an exception must be made. *Id.*

As to Juneau's testimony regarding Swanson's statements, the Michigan Court of Appeals held that *Chambers* did not require admission of the testimony it considered to be hearsay because it was not inculpatory to Swanson or exculpatory to the Petitioners and because the testimony was not corroborated. Petitioners are correct in asserting that Swanson's statement was inculpatory, as least insofar as it constituted an admission to aiding and abetting the murders. *See, e.g., People v. Davenport*, 332 N.W.2d 443, 445 (Mich. App. Ct. 1982) (driver of car liable as aider and abettor). The statement was also inconsistent with the prosecution theory that Dennis Vesey drove the Petitioners to the scene of the crime, and it arguably had some support from Joyce and Tanet Jordan who identified Swanson as being at the scene. However, the evidence was not exculpatory toward Petitioners, or corroborated, to the same degree as the evidence in *Chambers*. In *Chambers*, a third party provided a written confession for murder,

11

fully exculpating the defendant.  410 U.S. at 297, 300-01.  Additionally, the testimony regarding Swanson did not contain the same degree of reliability as the admitted statements in *Chambers*. There, in addition to making an inculpatory statement, the third party made *three other* independent admissions that he committed the murder before eventually recanting.  *See Chambers*, 410 U.S. at 300-02.  The state court's holding that *Chambers* did not compel inclusion of this testimony was not an unreasonable application of Supreme Court precedent.

As to Maurice Robinson's purported statement that he spent the night driving around with "Juan" and his knowledge of the crimes, the Michigan Court of Appeals used similar reasoning.  Here, too, the testimony did not bear such assurances of trustworthiness that exclusion of it was unreasonable under *Chambers*.  Additionally, it is not clear that this evidence would have been exculpatory because other testimony indicated that Dennis Vesey was also known by the name "Juan."  Thus, although Petitioners otherwise presented a possibility for third-party guilt, the state court's decision was not contrary to or an unreasonable application of federal law.  Accordingly, we **AFFIRM**.