NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0532n.06
No. 13-5870

**FILED**

**'JUL 2 1 2014**

**DEBORAH S. HUNT, Clerk**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PERRY AVRAM MARCH, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| GERALD MCALLISTER, WARDEN, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE: KEITH, CLAY, and McKEAGUE, Circuit Judges

DAMON J. KEITH, Circuit Judge. On August 17, 2006, in the Criminal Court for Davidson County, Tennessee, Perry A. March was convicted of murdering his wife Janet nearly a decade prior. In this habeas appeal, Petitioner March, initially proceeding *pro se*, and later retaining counsel, makes three challenges to the admission of certain of his incriminating statements on grounds that they were obtained in violation of the Fifth and Sixth Amendments. On two of his three claims, we assume without deciding the existence of constitutional error, only to conclude that in light of the significant evidence adduced against March, any errors would be harmless. As to March's third challenge, although the facts present a close legal question, we are unable to conclude that the Tennessee appellate court unreasonably applied federal law, and accordingly we reject this claim as well. Accordingly, we **AFFIRM** the district court's denial of March's writ of habeas corpus.

I.

March and his wife were married in 1987 and thereafter took up residence in Nashville. March enrolled at Vanderbilt Law School, with full financial support from the victim's parents (the "Levines"), and was eventually employed as an attorney at a Nashville law firm. The couple undertook marriage counseling in 1991 or 1992, and the record reflects that the two were experiencing marital problems thereafter. March began to see a psychiatrist, whose sessions into which the victim joined in 1996. The victim's mother, Ms. Levine, testified that at that point the situation had seriously deteriorated. March confided in her his fears that a divorce was imminent. Eventually, the situation was so bad in 1996 that the victim demanded that March find alternative housing.[1]

Ms. Levine had planned on accompanying the victim to see a divorce lawyer on August 16, 1996. However, around midnight on August 15, 1996, March called the Levines to inform them that the victim had left the house after an argument. The victim was never seen again. The events that followed pertaining to the victim's disappearance were described as highly uncharacteristic. A non-exhaustive list of unusual circumstances include: abnormalities as to the victim's computer usage; handwriting; credit card usage; the lack of an itinerary and otherwise detailed instructions as to her absence; the victim's repeated absence away from her children, for whom she had made birthday and school plans; and vehicular inconsistences. In short, the trial testimony established that a permanent change of scenery was antithetical of the victim's habits, customs, and ethos.

---

[1] Ms. Levine testified that March stayed in a hotel for approximately six to eight nights before the victim's disappearance.

Memorial services were eventually held for the victim, which March did not attend. March initially moved the children to Chicago, and then in May 1999, moved the family to Mexico. With regards to evidence as it relates to March, much of the testimony established at trial detailed him as volatile and hostile, making sundry threats to the victim's friends, family members, and confidants, as well as exhibiting similar behavior towards investigators, police officers, and psychiatrists. March's demeanor, especially when approached by authority figures, is detailed as having been frequently impatient, frustrated, and irritated. Certain anomalies and facts inconsistent with the victim's purported voluntary disappearance include, but are not limited to: the house having been cleaned the morning after the incident but before the housekeeper arrived; March's presence at 1:00 am the night of the incident walking a bicycle down a parking lot where the victim's car was later discovered; ripping out his computer's hard drive; turning white and shivering when the police arrived; commenting that "Fucking Janet ruined my life"; purchasing new tires and wiping disinfectant in his car; asking victim's long-time friend Diane Saks if she could believe a scenario in which he would put the victim in the back of his vehicle, leave the children home alone while they were sleeping and then return and pretend "like nothing ever happened"; penning a manuscript portraying the murder of a young woman; telling Mexican businessmen that if he did not help him "he would do away with us the way he did with his wife"; and the victim's discovery of evidence of a sexual harassment suit filed against March by a paralegal at his law firm, as well as evidence that March's settlement of that suit had rendered March in arrears.

Arthur March, the Defendant's father, played an instrumental role in both the victim's disappearance and the subsequent plot to murder the Levines. He was deposed, and the

corresponding videotape of the deposition was played before the jury. Arthur March arrived in Nashville three to four days after the victim's disappearance. He testified that his son admitted to him that the victim had died in an "accident" after an argument. March asked his father to dispose of his computer's hard drive, which he did. March also asked his father to dispose of the victim's remains, which he also did: after following March's instructions, his father bought a shovel and Clorox bleach and, after following directions provided to him, unearthed a large leaf bag containing the victim's remains located in a wooded area. Arthur March stated that he saw certain bones in the bag and that the bag weighed approximately fifty or sixty pounds. March and his father drove northwards to Chicago, where Arthur March disposed of the victim's body and clothes underneath brush.

March moved to Mexico, and, after nine years on the lam, was arrested there on August 3, 2005. March was transported to a jail in Los Angeles, California, where he waived extradition. Detectives Pat Postiglione and Bill Pridemore of the Metro Nashville Police Department escorted March from Los Angeles to Nashville via plane on August 12, 2005. Detective Postiglione, to whom March spoke to most frequently, informed March that he understood that Defendant was an attorney and that he had no intention of interrogating him. Although Postiglione conveyed that March was under no obligation to speak to him, Postiglione did not provide March a *Miranda* warning. He also said that he would "certainly listen" and relay whatever March had to say to the appropriate authorities. Postiglione testified that he was aware that March was represented by counsel.

Generally, March indicated a willingness to plead guilty to murder, but was persistently inquisitive with Postiglione. Postiglione, although generally reserved in conversation,[2] held steadfast in reminding March he did not have the authority to negotiate a plea deal, made the following statements during the flight to Nashville:

1) "[S]ometimes things happen that some people may perceive one way when, in fact, it is something totally different. I used as an example—a moment of anger instantly regretted. I gave the scenario of someone killing someone else by accident compared to walking up behind someone and shooting them in the back of the head—and said that there is a stark difference between the two"; and 2) in response to March's statement that he intensely loved the victim, "sometimes people hurt people they love in a moment of anger."

March was held at the Davidson County Criminal Justice Center, where he met Russell Nathaniel Farris, an inmate who was unable to make bail. March was under the mistaken assumption that Farris was imprisoned for first-degree murder—accordingly, March solicited Farris' help in a plot to murder the Levines. In return, March offered the possibility that he would raise the money to secure Farris' bond. March and Farris discussed the murder plot every day for about one month.

Farris grew concerned about his role in the murder plot, the details of which had grown in-depth and particular. In September 2005, Farris contacted his mother and his attorneys about the plot in an attempt to disassociate himself with the murder plot. Eventually, the details of the plot were forwarded to Sergeant Postiglione. Postiglione met with Farris on October 4, 2005 at the District Attorney's office, at which point Farris officially withdrew from the conspiracy and agreed to participate in a jailhouse investigation. Farris consented to the placement of a digital

---

[2] "I further told him that we would not pressure him in any way or try to interview him or get any sort of a statement; but I invited any questions or comments he may have, to feel free to share that with us, if he wanted to."

recorder in Farris' cell. At the behest of the authorities, Farris returned to his cell and informed March that he would be able to make bond. March began to finalize the plan to kill the Levines, involving an impressively elaborate plan in which Farris was to meet with Arthur March who would help facilitate the hit and then provide safe haven in Mexico. Farris telephoned March multiple times after his release in an attempt to finalize the plot. Eventually Arthur March was arrested, and brought Postiglione to the location where the victim was buried, though the remains were never found.

While still incarcerated, at different times, March was housed in a cell adjacent to the cell of Cornelius King and Reno Martin. While he spoke to King, he detailed the circumstances preceding the murder. According to King, March stated that there was an argument, that the victim wanted a divorce, and that March was "not going to allow that." A physical altercation ensued and March struck the victim over the head with a wrench. In a conversation with Martin—with whom March was friends—March discussed his ongoing custody battle with the Levines. March said "that it should have been them that [I] took care of instead of . . ." at which point March "went completely pale," and "lost his expression on his face."

On August 17, 2006, after a nine day trial, March was convicted by a jury of second-degree murder, destruction of evidence, and abuse of a corpse. In a separate case arising out of March's attempts to kill the victim's parents—thereby precluding the admission of their potentially damaging testimony—March was also convicted of conspiracy to commit first-degree murder. Combined, March was sentenced to a total of fifty-six years' imprisonment.

March filed his *pro se* petition for the writ of habeas corpus in the Eastern District of Tennessee on February 3, 2012. The case was transferred to the Middle District of Tennessee,

6

which denied his habeas petition in a forty-eight page Memorandum Opinion issued on June 19, 2013. *March v. Sexton*, 3:12-CV-272, 2013 WL 3147222 (M.D. Tenn. June 19, 2013). Nevertheless, the district court granted a Certificate of Appealability to each of his claims addressed in his petition. March appeals.

## II.

We review the District Court's decision to dismiss the writ of habeas corpus *de novo*. *Ruimveld v. Burkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Because March appeals from a state court proceeding, his petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the "Supreme Court opinions interpreting it." *Jones v. Bagley*, 696 F.3d 475, 482 (6th Cir. 2012). The AEDPA standard is "highly deferential." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) *reh'g denied*, 131 S. Ct. 2951 (U.S. 2011).

The deferential standard is formidable. Under the AEDPA, we may not grant a *habeas* petition unless the state court decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth by the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision will also be contrary to clearly established federal law if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at

a result different from that decision. *Id.* at 406. A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Id.* at 407-08. A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409. To obtain relief, "a habeas petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bagley*, 696 F.3d at 483 (internal quotations and citations omitted).

III.

*A. The In-Flight Statements*

March challenges the introduction of statements he made during his post-arrest flight from Los Angeles to Nashville on August 12, 2005. March argues that the introduction of this evidence violates both his Fifth Amendment privilege against self-incrimination, as per *Miranda v. Arizona*, 384 U.S. 436 (1966), and his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201 (1964). In light of the significant evidence of guilt adduced against March at trial, we assume without deciding that the admission of these statements was constitutional error.[3]

---

[3] We find the following statements by Detective Postiglione to be the most troubling: a) "[S]ometimes things happen that some people may perceive one way when, in fact, it is something totally different. I used as an example—a moment of anger instantly regretted. I gave the scenario of someone killing someone else by accident compared to walking up behind someone and shooting them in the back of the head—and said that there is a stark difference between the two"; and b) in response to March's statement that he intensely loved Janet, "sometimes people hurt people they love in a moment of anger." However, because we hold that any error was harmless, we need not determine whether the statements constituted functional interrogation.

Under *Brecht v. Abramhamson*, error is not harmless in a habeas case when it had substantial and injurious effect or influence in determining the jury's verdict. 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, 551 U.S. 112, 120 (2007) (adopting *Brecht* standard and eschewing the "harmless beyond reasonable doubt" standard). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Brecht*, 507 U.S. at 637 (internal quotations omitted). The burden for showing an error to be harmless is on the government. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009). Thus, we must decide whether the admission of the disputed statements subjected March to actual prejudice in his second-degree murder conviction.

In Tennessee, second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39–13–210(a)(1). Knowingly "means that a person acts with an awareness that . . . his . . . conduct is reasonably certain to cause the death of the alleged victim." *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002); *see also* T.P.I.-Crim. 7.05(a) (7th ed. 2002). Significant evidence exists which would support a conviction of second-degree murder as defined by the Tennessee statute. We emphasize that a) March's statement that the victim died in an "accident" after an argument; b) Arthur March's destruction of the computer hard-drive at his son's request; c) Arthur March's disposal of the victim's remains;[4] d) March's admission that

---

[4] Arthur March testified via deposition that he saw some of the victim's bones in the leaf bag and that the bag weighed approximately fifty or sixty pounds. At trial, the government's expert testified that, under the circumstances in this case, the victim's skeletal remains would weigh approximately fifteen pounds. March asserts that Arthur March's testimony violates the "physical facts rule," which states that the testimony of a witness that is opposed to the laws of nature or which clearly conflicts with principles of science cannot be given any probative value by a jury. *See Harris v. General Motors Corp.*, 201 F.3d 800, 803 (6th Cir. 2000). "In examining a claim of insufficiency of evidence in habeas corpus, a federal court must presume that the jury's findings in evaluating the

he murdered the victim to Reno Martin, Cornelius King, and Jose Pulido; and e) March's statement to the Mexican businessmen that he would "do away with them the way he did with his wife," concretely support a finding that the trial evidence supported a murder conviction against March.

The significant and extensive background evidence illustrating discontent between March and the victim, particularly the evidence establishing that the victim had unearthed information about his sexual harassment against Leigh Reames, as well as evidence of the victim's laundry list of reasons in which March had mistreated her, establishes that the act was not an accident. In reaching this conclusion, we also rely on the numerous inconsistencies and abnormalities in the victim's disappearance and March's behavior following the crime, the sheer multitudes of which preclude an exhaustive list. Statements such as "Fucking Janet ruined my life," and the hypothetical question posed to the victim's long-time friend—whether could she believe a scenario in which he would put the victim in the back of his vehicle, leave the children home

---

credibility of the witnesses is correct and may ignore the testimony only when it finds it to be 'inherently incredible.'" *Malcum v. Burt,* 276 F.Supp.2d 664, 686 (E.D. Mich. 2003).

We first observe that at trial, March did not move to strike Arthur March's testimony when it became apparent that it was purportedly factually impossible. To preserve a claim of error in the admission of evidence, a party must timely object to or move to strike the evidence. Fed. Rule Evid. 103(a)(1). Accordingly, we review the admission of Arthur March's testimony for plain error only. To establish plain error, Harris must show that an error (1) occurred, (2) was plain, i.e. obvious or clear, (3) affected his substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Harris,* 200 F. App'x 472, 490 (6th Cir. 2006). Although Arthur March's approximation of the weight of the bag is belied by the expert witness, it is entirely plausible that the skeletal remains were not the only tangible materials in the bag. Indeed, evidence was established at trial which would tend to support a theory that the victim's body was rolled into a rug or carpet, thrown into the victim's Jeep, and then discarded: 1) the day after the incident, Friday, August 16, 1996, March's son was seen was jumping on a rolled up oriental rug in the entry hall; 2) Ella Goldshmid, the March's part-time babysitter, testified that she had never seen the rug before, but saw it that morning blocking the path to the kitchen, and never saw the rug again; and 3) Detectives found both carpet fibers and the victim's hair samples inside the Jeep's trunk area. Any multitude of possibilities exists for the jury to conclude that the victim's remains were not the only tangible items in the bag. Thus, we do not find Arthur March's statements to be "inherently incredible," *Malcum,* 276 F. Supp.2d at 686, nor do we find that the admission of his testimony was plainly erroneous.

10

alone while they were sleeping and the return and pretend "like nothing ever happened," are especially indicative of guilt. March's bizarre and apprehensive behavior when confronted by the victim's family members and authorities further support the jury's verdict.

Another relevant consideration in *Brecht* was the infrequency or relative brevity of the disputed testimony in relation to the length of the testimony *in toto*. 507 U.S. at 639. In *Brecht*, "the State's references to petitioner's post-*Miranda* silence were infrequent, comprising less than two pages of the 900–page trial transcript in this case." *Id.* Here, Postiglione's testimony on direct examination regarding the petitioner's statements comprised about three pages of an approximately 2,500-page trial transcript over the course of a nine-day trial. Postiglione was but one of dozens of witness to testify against March. We are firmly convinced that the relatively brief testimony from Postiglione, amongst the great depths of incriminating evidence against March, led to no actual prejudice against March. Indeed, this is not the case in which we are "in virtual equipoise as to the harmlessness of the error," 551 U.S. at 121 (quoting *O'Neal*, 513 U.S. at 435 (1995)), but rather where, in reviewing habeas corpus matters, "we do not close our eyes to the reality of overwhelming evidence of guilt." *Milton v. Wainwright*, 407 U.S. 371, 377 (1972). Accordingly, we hold that any constitutional error would have been harmless in light of the extensive evidence establishing March's guilt.[5]

B. *The Jailhouse Conversations*

March challenges the introduction of his jailhouse conversations with co-inmate Nathaniel Farris, the details of which surrounded the plot to kill the Levines. Specifically, March

---

[5] Although March alleges that the cumulative effect of the errors at trial rendered his trial fundamentally unfair in violation of due process, he is without remedy. "The law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *see also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

alleges that the government knowingly circumvented his Sixth Amendment right to counsel by eliciting incrimination that was to be introduced in a criminal matter for which he was already represented. The Tennessee appellate court disagreed. Relying on *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980), *McNeil v. Wisconsin*, 501 U.S. 171 (1991), and *Texas v. Cobb*, 532 U.S. 162 (2001), the court held that under the "offense specific" doctrine, because the statements pertained to a *future*, uncharged crime, the Sixth Amendment right to counsel did not attach. The district court agreed.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding. *Maine v. Moulton*, 474 U.S. 159, 169 (1985). Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, "critical" stages in the criminal justice process "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *Id.* at 170. Once judicial proceedings have been initiated against the defendant, the right attaches, and the right to counsel must be honored. *Id.* Where the defendant has been indicted and the case "involves incriminating statements made by the accused to an undisclosed and undercover Government informant while in custody and after indictment," the right has attached. *United States v. Henry*, 447 U.S. 264, 269 (1980); *see also Massiah*, 377 U.S. at 206 (noting that the right must be especially safeguarded where the defendant is unaware of the informant's role as a government agent). At the very least, "the prosecutor and police have an affirmative obligation not to act in a

manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 171.

March urges us to conclude that *Maine v. Moulton*, 474 U.S. 159, 171 (1985), is "materially indistinguishable" from this case. *Williams*, 529 U.S. at 406. Although the facts are somewhat similar, we cannot so conclude. In *Moulton*, the police sent a co-defendant turned informant to elicit incriminating statements from the other co-defendant. The police did so with express knowledge that the government agent and the defendant were to discuss both prior and future crimes. The government introduced this testimony in the case which pertained to the prior crime, for which the Sixth Amendment right had attached. The court held that the defendant's Sixth Amendment rights were violated pursuant to the elicitation of incriminating statements. Critically, however, most of the testimony admitted at trial corresponded to the prior, *already charged* offenses. In this case, Farris and March almost exclusively discussed the *future* plot to kill the Levines, eluding discussion of the already-charged murder offense.

Nevertheless, *Moulton* made two important rulings. The first was the actual holding that, "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." *Id.* at 180. The second was to reaffirm the holding in *Massiah* that "the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." 377 U.S. at 207. Indeed, the *Massiah* Court went on to hold that a defendant is denied "the basic protections of [the Sixth Amendment] when

13

there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him." *Id.* at 206.

At first blush, it would seem that the Tennessee authorities violated *Moulton* on the grounds that the State solicited "incriminating statements pertaining to pending charges . . . notwithstanding the fact that the police were also investigating other crimes." *Moulton*, 474 U.S. at 180. However, relying on the "offense specific" nature of the Sixth Amendment, the Tennessee appellate court held that the State did not knowingly circumvent the accused's right to the assistance of counsel. *State v. March*, 395 S.W.3d 738, 779 (Tenn. Crim. App. 2011). Indeed, the court clarified that "a defendant's invocation of his or her right to counsel as to an indicted offense is not an invocation of the right to counsel in future prosecutions." *Id.* at 776; *see also McNeil*, 501 U.S. at 176.

The cases which opine on the "offense specific" nature of the Sixth Amendment present scenarios in which incriminating statements made with respect to future crimes are always introduced in those corresponding future trials; no Supreme Court case exists with respect to evidence of future crimes being used to assist in the conviction of past crimes, for which the defendant's right to counsel has already attached. Indeed in *McNeil*, the defendant, originally held on armed robbery charges, was questioned about murder and burglary charges in a completely different town. *McNeil*, 501 U.S. at 173-76. Evidence of these statements, obtained in the absence of counsel, was admitted to help convict that defendant of the murder and burglary charges, but was not specifically admitted to show his guilt in the original armed robbery charges. *Id.* Thus, *McNeil* is inapposite.

14

*Texas v. Cobb* is likewise unhelpful. In that case, the defendant confessed to burglarizing the home of a woman and her infant daughter who, contemporaneous to the burglary, also went missing. The defendant later confessed to murdering both the woman and her child in the process of the burglary. The defendant was convicted of capital murder for murdering more than one person in the course of a single criminal transaction. *Id.* at 166; *see* Tex. Penal Code. Ann. § 19.03(a)(7)(A)(1994). The defendant contended that, as he was represented by counsel after the burglary case, his Sixth Amendment right to counsel had attached, and thus any statements made with respect to the double murder were inadmissible. *Cobb* is factually inapposite: there, the defendant made incriminating statements as to a second, uncharged offense (murder), which were then used against him in the trial of that *second* offense. The case *sub judice* concerns statements about the *second* offense used against the defendant at the trial of the *first* offense, for which the right has already attached.[6]

Thus, the facts are neatly wedged between the principle that a) a person is "denied the basic protections of [the Sixth Amendment's] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel," *Massiah*, 377 U.S. at 206; and b) the tenet that a defendant's voluntary statements concerning a crime for which he has not yet been charged are admissible at a subsequent trial of the inchoate offense. *Cobb*, 532

---

[6] In addition to *McNeil's* and *Cobb's* factual dissimilarity, the Sixth Amendment's "offense specific" nature actually cuts in March's favor. The Sixth Amendment gives a defendant the right "to rely on counsel as a 'medium' between him and the State." *Moulton*, 474 U.S. at 176. *McNeil* and *Cobb* make clear that it is the first offense, and not the second, uncharged offense for which the defendant may rely on counsel. As the facts in this case show, March was unable to rely on counsel as a medium in his murder case if he was being induced to give incriminating statements as to his murder case by a State authority; that he was being questioned on an unrelated offense is inconsequential.

15

U.S. at 173. The Supreme Court has not authored a case in which the government has intentionally placed an agent to elicit incriminating testimony as to a *future plot*, but not past actions, with the intention of using the future plot as evidence of a guilty mind.[7] *Contra Maine v. Moulton*, 474 U.S. 159, 163-65 (1985) (police intentionally send co-defendant-turned-informant to elicit information, both to discuss future plots but also "to discuss the charges for which [the other co-defendant] were already under indictment.").

In spite of *McNeil* and *Cobb,* we are unconvinced that the "offense specific" doctrine limits the applicability of *Massiah*'s holding that "the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial," 377 U.S. at 207, in this case. We are aware of no precedent which distinguishes amongst elicited incriminating statements— whether they pertain to a charged offense, to an uncharged offense, or to no offense whatsoever. So long as the incriminatory statements are introduced in a matter in which the defendant's right to counsel has already attached, a violation occurs.

It was clear that questioning March about the plot to murder government witnesses would result in March making incriminating statements as to the murder charge, for which he was already represented. March had a right to counsel present as a medium if the government

---

[7] The First Circuit has done so, however, in *United States v. Bender*, 221 F.3d 265 (1st Cir. 2000), a case which provides nearly identical facts. According to that court: "Instead, the government contends, primarily, that, since the incriminating statements concerned different and future crimes, unrelated, it says, to the pending charges, the Sixth Amendment does not apply. We disagree. The statements were incriminating not only as to future crimes (perjury, conspiracy to kidnap and murder) but also as to the pending charges. So long as the statements were incriminating as to the pending charges and were deliberately elicited by government agents, they cannot constitutionally be admitted in the trial of those charges." *Id.* at 269. Indeed, as here, the First Circuit found that the evidence of future malfeasance constituted strong evidence of a guilty mind at work. The court held that it was obvious that the intentional elicitation of evidence of future related crimes, in the absence of counsel, was in clear violation of the Sixth Amendment. *Accord Mealer v. Jones*, 741 F.2d 1451, 1453-55 (2d Cir. 1984). *Bender*, of course, is a circuit case, and is thus impotent under the AEDPA framework.

16

planned on using the testimony in his murder case. Farris' questions were likely to be incriminating as to the pending charges, and, although they would be admissible at the second prosecution for murder conspiracy, we conclude that using his statements to his original murder case was a violation of his Sixth Amendment right to counsel. *See Fellers v. United States*, 540 U.S. 519, 524 (2004) (police are prohibited from the "deliberate elicitation" of information from a represented defendant without a waiver of his right to counsel or his counsel's consent).

We are compelled to comment on the issue in light of the possibility for abuse; we will not undermine the right to have counsel as a medium between the defendant and the government. Indeed, were we to find otherwise, State authorities could, through well-architected subterfuge, elicit incriminating information from defendants under the pretext of conducting an investigation into fabricated or trumped-up future charges.[8] Using this tactic to solicit evidence of a guilty mind would befall many potential future defendants. We urge caution in similar cases to ensure that government officials do not subvert "the basic dictates of fairness in the conduct of criminal cases and the fundamental rights of persons charged with crime." *Massiah*, 377 U.S. at 205.

Nevertheless, our review is not simply whether this was error, but, under AEDPA, whether the case involved an unreasonable application of federal law. 28 U.S.C.A. § 2254(d)(1) (An unreasonable application of federal law sufficient to support a writ of habeas corpus is different from an incorrect application of federal law). To satisfy this standard, March must show that the state court correctly identified the governing legal rule but applied it unreasonably to the facts of his case, or that it either unreasonably extended or unreasonably refused to extend

---

[8] We need look no further than the two-step interrogation employed in *Missouri v. Seibert*, 542 U.S. 600, 602 (2004) for an example of deliberate legal exploitation. ("[U]nwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill.").

a legal principle from Supreme Court precedent to a new context. 28 U.S.C. § 2254(d); *Sanborn v. Parker*, 629 F.3d 554, 564 (6th Cir. 2010). Indeed, this standard gives more deference to the state court than would a "clear error" approach. *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003).

We disagree with the District Court's conclusion that the Tennessee court applied the correct legal rule—the governing law is not the *McNeil-Cobb* line of cases but rather *Massiah*, and, to an extent, *Moulton*. However, we would be remiss to conclude that the debate is "beyond any possibility for fairminded disagreement," *O'Neal v. Bagley*, 728 F.3d 552 (6th Cir. 2013); rather we think that a somewhat fair argument may be made to the contrary. Indeed, to extend *Massiah's* holding that the elicitation of information—irrespective of its pertinence to charged or uncharged crimes—was called into question in the four-Justice *Moulton* dissent. 474 U.S. at 188 n. 3 (1985) ("The Court's opinion seems to read *Massiah* as if it definitively addresses situations where the police are investigating a separate crime."). That the Supreme Court has not opined on this unusual factual scenario almost *ipso facto* allows us to conclude that the state court did not *unreasonably* err. Accordingly, even though we find that the Tennessee appellate court incorrectly applied the right legal rule, with no Supreme Court case resolving this unsettled legal quandary, we are unable to conclude that the court unreasonably applied clearly established federal law. *See Fleming v. Metrish*, 556 F.3d 520, 527–28 (6th Cir. 2009) ("the fact that a federal court might disagree with the [state court's] application of [federal law] does not justify the conclusion that the [state court] unreasonably applied the Supreme Court's decision."). As such, we **AFFIRM** the district court's denial of March's writ of habeas corpus.