RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARVIN G. JOHNSON,

     *Petitioner-Appellant,*

  *v.*

DAVID BOBBY, Warden,

     *Respondent-Appellee.*

┐

│

│

> No. 22-3544

│

│

┘

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:08-cv-00055—Sarah Daggett Morrison, District Judge.

Argued:  June 9, 2025

Decided and Filed:  March 19, 2026

Before: READLER, DAVIS, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Kort W. Gatterdam, CARPENTER LIPPS LLP, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Kort W. Gatterdam, CARPENTER LIPPS LLP, Columbus, Ohio, Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant.  Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

DAVIS, Circuit Judge.  Angry with his ex-girlfriend for breaking up with him and making him move out of her home, Marvin Johnson kidnapped and killed her thirteen-year-old son and then raped and robbed her.  An Ohio jury convicted him for his actions and

recommended the death penalty.  He thereafter was sentenced to death.  After exhausting his appeals in state court, Johnson filed a federal habeas corpus petition under 28 U.S.C. § 2254.  Johnson appeals the district court's denial of that petition.  While the case was pending before us, in 2024, the state court found Johnson seriously mentally ill, vacated his death sentence, and resentenced him to life in prison without the possibility of parole.  The parties disagree about whether the new judgment renders Johnson's petition moot and strips us of jurisdiction.  It does not, save for those claims that concern the penalty phase of Johnson's prosecution.  So we move on to consider what remains of the two claims the district court certified: whether Johnson's trial counsel was ineffective in allowing the jury to hear about Johnson's criminal history and whether his appellate counsel was ineffective in failing to raise a Confrontation Clause claim in relation to statements made to police by a jailhouse informant.  With any penalty-phase challenges now moot because of Johnson's resentencing to life without parole, we review the claims before us as guilt-phase attacks.  We AFFIRM.

## I.

### A.  Factual Background

Johnson began dating Constantina "Tina" Bailey in the late 1990s.  *State v. Johnson*, 858 N.E.2d 1144, 1152 (Ohio 2006).  They lived together until 2000, when Johnson went to prison for violating parole in connection with a 1988 arson conviction.  When released in 2002, he returned to her, and she took him into her home.  *Id.*  But the relationship had its problems.  Johnson often spent his paycheck on crack cocaine.  "And due to his drug habit, he only reluctantly contributed money to the household."  *Id.* at 1153.  "He also had a strained relationship with Tina's two children, especially Daniel, because [Johnson] resented Tina's generosity toward them."  *Id.*  Plus, Johnson sometimes was jealous of one of the couple's friends, Utelius Barnes, because Johnson suspected that Barnes and Tina had a relationship.  *Id.*

### 1.  Lead-up to the Crimes

Finally, on July 3, 2003, Tina told Johnson to move out.  Forty-three days later, on Friday, August 15, 2003, Johnson returned to Tina's home to murder and kidnap Daniel—and to rape and rob Tina.  *Id.* at 1153–54.

After Tina put Johnson out of her home, he moved in with Lisa Wilson, a friend of his who sold crack. He stayed with Wilson on and off during the time leading up to the kidnapping, murder, rape, and robbery. *Id.* at 1153.

Tina, meanwhile, allowed Johnson into her house two or three times after July 3rd but made it clear that he did not have permission to come in when she was not there. He came in twice anyway, while she was at work.

The second time, he still was there when Tina returned. *Id.* She ordered him to leave. *Id.* He refused, daring her to call the police. *Id.* "As they argued, according to Tina's trial testimony, Johnson pulled his arm back, as if to strike her, and he warned that she shouldn't be surprised if she found her house in ashes." *Id.* (citation modified). "Eventually, he voluntarily left her home." *Id.*

On Tuesday, August 12, three days before the murder, Johnson went to his friend Wilson and told her that "he was having sick thoughts he couldn't get out of his head" and "that he needed to talk to somebody about them." (R. 83-10, Trial Tr., PageID 7239). One sick thought he told Wilson about was killing Tina. (*Id.* at PageID 7239–40). Another was: "tying [Tina's] son up and gagging him and making sure he could breathe and putting him down in the basement and holding him for ransom." (*Id.* at PageID 7240). According to Wilson, Johnson appeared to be sober while making these statements. Johnson also told Wilson that "he had a key to [Tina's] sliding glass door." (*Id.* at PageID 7243).

Wilson tried to talk some sense into Johnson. She testified: "We talked for a couple hours and at the end of the conversation he said that he wouldn't hurt either [Tina] or her son." (*Id.* at PageID 7240). Yet Johnson did not fully abandon pursuing some form of revenge. Wilson believed from this conversation that Johnson might "break into [Tina's] house and steal a couple checks or her ATM card or BP card." (*Id.*). But Johnson had clarified that "after that he wouldn't do anything to hurt her." (*Id.* at PageID 7240–41).

On Wednesday, two days before the murder, Johnson "promised he wouldn't bring any harm to [Tina] or [Daniel,] but he said he was considering breaking in and using the key to the sliding glass door and stealing a couple checks." (*Id.* at PageID 7243–44).

2. *The Crimes*

Tina worked the night shift from Thursday night through Friday morning, August 14 to 15. *Johnson*, 858 N.E.2d at 1153. Her daughter, who was significantly younger than Daniel, stayed with Tina's mother on those occasions. This left Daniel alone in the house. *Id.*

Johnson was at Wilson's house that night, sleeping on the couch. But at about 3:40 a.m., Friday, August 15, he got up and began rummaging through a bag of old shoes that Wilson had. *Id.* His quarry: the shoelaces. They later would be found around Daniel's wrists and ankles, binding them tightly. *Id.* at 1154. Preparations complete, Johnson lay back on the couch but got up for good around 5:00 a.m. and left Wilson's house. *Id.* at 1153, 1159.

Johnson then went to Tina's house. Sometime between 5:00 and 6:00 a.m., he bludgeoned Daniel to death. *Id.* To do so, he "used a blunt object (a 2x4 board or brick)"—applied vigorously to the boy's head five or six times. (R. 82-9, State Sentencing Op., PageID 2247); *see also Johnson*, 858 N.E.2d at 1153 ("a blunt instrument"). The force fractured Daniel's skull and bruised his face, as blood flew about the living room. *Johnson*, 858 N.E.2d at 1153. "The blows caused Daniel's brain to swell within the skull cavity until his breathing stopped." *Id.* Daniel did not succumb immediately, however. He was alive while Johnson gagged and hogtied him, then carried him to the basement, where Johnson hid Daniel behind the washing machine. *Id.* at 1154.

After hiding Daniel, Johnson "wait[ed] on [Tina] to come home from work." (R. 82-9, State Sentencing Op., PageID 2249–50); *see also Johnson*, 858 N.E.2d at 1159. He used the two or three hours that elapsed to conceal evidence of the beating. Using a card table, children's games, a blanket, and propped up pillows, he hid the blood spots on the living room carpet.

Tina got home around 8:00 in the morning. Barnes (the friend of whom Johnson was jealous) and another man had arrived to do remodeling work at the house. Tina and Barnes went inside and discussed the work for about 20 minutes. Then she went upstairs. *Johnson*, 858 N.E.2d at 1154. She heard water running in the shower.

Johnson emerged from the bathroom with a knife in his hand and blood on his shirt. *Id.* at 1154. "As Johnson held the knife up in front of her, Tina asked him to put it down, and said, '[W]here's Daniel, what did you do to Daniel[?]'" *Id.* (alterations in original). Johnson took her to the bedroom. "When Tina began to hyperventilate, Johnson told her to 'calm down' and to 'keep quiet' because Barnes and another home-remodeler were nearby." *Id.* He told her that "if she did not obey, 'he couldn't guarantee that Daniel would be okay.'" *Id.* Johnson ordered Tina: "Take off your clothes," and told her, "As long as you do what I say, Daniel Bailey will be OK." (R. 82-9, State Sentencing Op., PageID 2247). Johnson then laid out his three major demands, summarized by the trial court thusly: a) have sex with him one last time; b) get him $1,000; and c) let him watch Barnes "f*ck" her. (*Id.*). When Tina asked why he was doing this, he replied, "This is the only way I know how to hurt you." *Johnson*, 858 N.E.2d at 1154 (citation modified).

Tina fulfilled the first two requirements. First, disrobing, she fellated Johnson, and he put his fingers into her vagina while he continued to hold the knife. *Id.* Both acts, whether performed by her on him or him on her, constituted rape, as she did not freely consent. *Id.*; *see also* Ohio Rev. Code Ann. §§ 2907.01(A), 2907.02(A)(2).

Afterward, Johnson told Tina to get dressed, so they could "go to the bank." *Johnson*, 858 N.E.2d at 1154. As they were leaving the bedroom, she asked him to put the knife down. He did so, returning to the bedroom and placing the knife under the mattress. *Id.* "Police later recovered [the knife] there with Johnson's thumbprint on it." *Id.*

Even without the knife, Johnson retained a potent weapon for coercion: Tina's fear for Daniel's safety. He alluded to fictitious accomplices, tried to make her believe "they" were holding Daniel captive, and told her that "if 'they' did not hear from [Johnson] by 9:30 or 10:00 a.m., he could not guarantee that Daniel Bailey would be OK." (R. 82-9, State Sentencing Op., PageID 2248).

Tina drove Johnson to her bank's drive-through window, where, between 8:48 and 8:50 a.m., she withdrew $1,000 and gave it to him. *Johnson*, 858 N.E.2d at 1154. The teller testified that Tina "appeared to be 'crying and upset.'" (R. 82-9, State Sentencing Op.,

PageID 2248). Johnson had Tina drop him off in a parking lot. He told her to go home and that he would call and tell her what he had done with Daniel. When she went home, she found Daniel in the basement, bound and gagged, lying face down behind the washing machine. *Johnson*, 858 N.E.2d at 1154. She attempted to revive Daniel before she ran upstairs and asked one of the remodelers to call the police. *Id.*

In the meantime, Johnson went to a friend's home, "where he took off his bloodstained shirt, left it on the floor, . . . borrowed a clean one," and then took a taxi to Zanesville. *Id.* at 1154–55. But the police there had been alerted that Johnson was coming and in what cab. *Id.* at 1155. They "spotted the cab and saw Johnson walking away from it." *Id.* Two officers "approached Johnson and ordered him to the ground. However, Johnson fled to an abandoned park and hid the money that he had taken from Tina." *Id.*

The police later recovered the money, the bank envelope, and the bloodstained shirt. The bloodstains matched Daniel's DNA profile. "[T]he chance of finding the same DNA profile in a random member of the population is one in more than 320 trillion." *Id.*

## B. Procedural Background

The jury convicted Johnson of two counts of aggravated murder: one categorized as felony murder and one as prior-calculation-and-design—with the felony-murder death specification attached to each. *Id.* The jury also convicted Johnson of rape, aggravated robbery, and kidnapping (this last, of Daniel, not Tina: hogtying him, carrying him to the basement, and hiding him while he still lived). *Id.* at 1155, 1157. They recommended a death sentence. *Id.* at 1155. The trial court imposed it, as well as a concurrent prison sentence of 30 years for the rape, aggravated robbery, and kidnapping. *Id*.

On direct appeal, the Ohio Supreme Court affirmed the convictions and the death sentence. *See id.* at 1186, *cert. denied*, 552 U.S. 836 (2007). Johnson applied to reopen the appeal to raise an ineffective assistance of appellate counsel claim, but the Ohio Supreme Court denied his application. *State v. Johnson*, 870 N.E.2d 728 (Ohio 2007) (Table). Johnson was no more successful with his state postconviction petition. *See State v. Johnson*, No. 2006-CA-04,

2007 WL 1098106 (Ohio Ct. App. Apr. 10, 2007) (affirming trial court's denial of the petition), *perm. app. denied*, 875 N.E.2d 101 (Ohio 2007) (Table).

Johnson timely filed his § 2254 petition in 2008, but in 2012, the case was held in abeyance while he returned to state court to exhaust new claims.

Back in state court, Johnson again filed a reopening application, and the Ohio Supreme Court again denied relief. *State v. Johnson*, 988 N.E.2d 577 (Ohio 2013) (Table). He also filed a successive postconviction petition, but that, too, was denied. *State v. Johnson*, No. 03-CR-116 (Guernsey C.P. July 18, 2012), *aff'd*, No. 12 CA 19, 2013 WL 1400607 (Ohio Ct. App. Apr. 1, 2013), *perm. app. denied*, 31 N.E.3d 654 (Ohio 2015) (Table).

In 2015, Johnson returned to federal court, and his habeas corpus case was reinstated. He filed an amended § 2254 petition raising 28 claims, of which only the following (as numbered in the district court) are now before us: (10) trial counsel were ineffective in permitting the jury to hear repeated testimony about Johnson's criminal history, and (13) appellate counsel were ineffective in failing to raise a Confrontation Clause error. The district court denied Johnson's claims and dismissed the action but granted a certificate of appealability ("COA") for Claims 10 and 13. Johnson moved to alter or amend the judgment. The district court denied him.

Johnson timely appealed and asked to expand the COA. We denied this request and ordered briefing on the certified claims. Johnson filed his brief; the Warden, his response. Only the reply brief was yet to go.

In the meantime, proceedings also were happening in state court. Even as his appeal before us was pending, Johnson had requested relief under Ohio's serious-mental-illness law. The state trial judge granted relief and, in October 2024, filed a judgment entry of resentencing. The trial court resentenced Johnson to serve a mandatory term of life imprisonment without parole eligibility for the murder convictions. His sentence otherwise remained the same (to concurrently serve 30 years for the rape, aggravated robbery, and kidnapping). And his convictions remained the same.

**II.**

*Standard of Review*

Johnson filed his federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so its standards govern. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). We review de novo the district court's legal conclusions, like its conclusions on mixed questions of law and fact, but we review its factual findings for clear error. *Jones v. Bagley*, 696 F.3d 475, 482 (6th Cir. 2012). If it based those factual findings merely on a reading of the state trial transcript, however, rather than an evidentiary hearing in the district court, we review them de novo. *See Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006).

Claims adjudicated on the merits in state court are barred in federal habeas proceedings, unless the state-court decision meets one of the exceptions outlined in 28 U.S.C. § 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 97–98 (2011). Habeas relief may be granted if the decision was (1) contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court or (2) based on an unreasonable determination of the facts given the evidence presented to the state court. *See* 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 97–98, 100. The petitioner carries the burden of proving that he has met this standard. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

When deciding whether a state-court decision is contrary to or involved an unreasonable application of clearly established Supreme Court precedent, we may look only to the holdings of the Supreme Court's decisions, not dicta. *White v. Woodall*, 572 U.S. 415, 419 (2014). And clearly established Supreme Court precedent is precedent that existed when the state court rendered its decision. *Greene v. Fisher*, 565 U.S. 34, 38 (2011). A state-court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

A state-court decision unreasonably applies that precedent when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts. *Woodall*, 572 U.S. at 426. The application must have been "'objectively unreasonable,' not merely wrong; even

'clear error' will not suffice." *Id.* at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). An unreasonable determination of the facts also must be objectively unreasonable in light of the evidence presented at the state-court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The contrary-to/unreasonable-application analysis does not apply to claims where the state court resolved without deciding the merits of the federal constitutional issues, as when the state court holds claims procedurally barred. *Maples v. Stegall*, 340 F.3d 433, 436–37 (6th Cir. 2003). Instead, if the federal court is the first court to reach their merits, we review the claims under pre-AEDPA law (de novo review applies to legal or mixed questions). *Id.* We presume that state-court factual findings are correct unless the applicant rebuts them by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## III.

*Jurisdiction*

As an initial matter, the Warden argues that the re-sentencing order "is a new sentencing judgment that renders moot the district court's denial of Johnson's habeas petition" and strips us of appellate jurisdiction. (Warden's Suppl. Br., ECF 33, 3). Johnson counters that he still is in custody for his underlying convictions, which remain intact and which his habeas appeal challenges, and the resentencing entry affected only his challenges to the death penalty. We see no impediment to our jurisdiction here over Johnson's claims concerning the guilt phase of his conviction.

### A. Habeas Review vs. Direct Appeal

The Warden's entire jurisdictional argument hinges on the view that our review is limited to the judgment Johnson's § 2254 petition attacked. It is not. We review the lawfulness of Johnson's confinement as a product of his conviction and sentence. *See Nance v. Ward*, 597 U.S. 159, 167 (2022) (defining the "core" of habeas corpus as a challenge to the validity of a conviction or sentence).

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation modified). Thus, the Warden's argument depends on limiting our power to review of the original judgment—the one Johnson's petition attacked but which is now vacated—and that limitation rendering it impossible for us to grant any relief.

The Warden's argument fails to account for the difference between habeas proceedings and direct appeal. As the Supreme Court wrote, contrasting the two: "[W]hile our appellate function is concerned only with the judgments or decrees of state courts, the habeas corpus jurisdiction of the lower federal courts is not so confined. The jurisdictional prerequisite is not the judgment of a state court but detention simpliciter." *Fay v. Noia*, 372 U.S. 391, 430 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977), *and abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991). And as we have long recognized, "[t]he literal meaning of the writ of habeas corpus . . . comes from the Latin habeas corpus which means 'you should have the body.'" *Taylor v. Egeler*, 575 F.2d 773, 773 (6th Cir. 1978) (per curiam). With the federal writ only affecting the petitioner's body, a grant of the writ requires the state to either release the prisoner or retry him. *Eddleman v. McKee*, 586 F.3d 409, 413 (6th Cir. 2009).

As *Noia*'s case history reveals, much has changed. But not the distinction between direct appeal and habeas.

> When this Court reviews a state court decision on direct review pursuant to 28 U.S.C. § 1257, it is reviewing the *judgment* . . . . This is not the case in habeas. When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman*, 501 U.S. at 730 (citing *Noia*, 372 U.S. at 430), *modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012).

No one denies that Johnson satisfies the prerequisite: detention simpliciter. He is being detained—for life. That gives us habeas power to review the lawfulness of his detention. Nor

does the Warden deny that we have personal jurisdiction.  He denies only subject-matter jurisdiction.**1**

The judgment of conviction, however, is not what activates habeas power.  *Noia*, 372 U.S. at 430–31.  Nor is that judgment the target of habeas review.  The federal court "cannot revise the state court judgment; it can act only on the body of the petitioner." *Id.* at 431.  That's the corpus in habeas corpus.  "Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him." *Id.* at 430–31.

Issuance of a new judgment resentencing Johnson to life without parole does not strip us of our inherent and constitutionally recognized habeas power to release Johnson from custody. *See* U.S. Const. art. I, § 9, cl. 2.  In *Kernan v. Cuero*, the Supreme Court faced a situation which is instructive here.  583 U.S. 1 (2017) (per curiam).  The federal court of appeals had granted habeas relief. *Id.* at 5–6.  "And the state trial court, in light of that mandate, ha[d] resentenced Cuero." *Id.* at 6.  But the petition for certiorari seeking to appeal the court of appeals' grant of habeas relief still was pending before the Supreme Court. *See id.* at 5.  The question for the Court was whether the state-court issuance of a new judgment rendered the controversy moot.  It did not.  "[N]either the losing party's failure to obtain a stay preventing the mandate of the Court of Appeals from issuing nor the trial court's action in light of that mandate makes the case moot." *Id.* at 6, 9 (granting certiorari and reversing the court of appeals).  If issuance of a new judgment mooted the habeas attack on the old judgment, the *Cuero* Court could not have reached that conclusion.

An applicant's custody pursuant to a state court's judgment is a gatekeeping requirement for filing a § 2254 petition.  But once that requirement is satisfied, issuance of a new judgment modifying the sentence does not necessarily strip the district court of jurisdiction or the reviewing court of appellate jurisdiction.  For after all, habeas courts review not a judgment "but the lawfulness of the petitioner's custody *simpliciter*." *Coleman*, 501 U.S. at 730.

---

**1**In his original response brief, he conceded our jurisdiction.  Only after notification of the modified judgment did he argue lack of subject matter jurisdiction.

Johnson's custody is lawful, for reasons discussed below.  But no one denies that it, quite simply, exists.  And likewise no one denies that Johnson continues to challenge his conviction, the basis for why he is in custody.  Our power to remedy any unlawfulness to his custody, then, exists too.  Put another way, as long as Ohio continues to incarcerate Johnson, the "incarcerated convict's . . . challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

Resisting this conclusion, the Warden argues that Johnson's § 2254 petition attacked a particular judgment—the one convicting him on all counts and specifications and sentencing him to death; now that judgment has been replaced by a new judgment, leaving the convictions intact but switching the death sentence to life without parole.  According to the Warden, this chain of events not only moots Johnson's penalty-phase arguments, but also strips our jurisdiction as to all of his claims.  For, "[f]inal judgment in a criminal case means sentence.  The sentence is the judgment." *Berman v. United States*, 302 U.S. 211, 212 (1937); *see also In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016).  And "[t]he sentence that matters in a habeas case . . . is the one 'pursuant to' which an individual is held 'in custody.'" *Stansell*, 828 F.3d at 416 (first quoting *Magwood v. Patterson*, 561 U.S. 320, 332 (2010); then citing 28 U.S.C. § 2254(a), (b)(1)).  When the sentence changed, says the Warden, the judgment changed.  And Johnson's § 2254 petition sought "invalidation (in whole or in part) of the judgment authorizing [his] confinement." *Magwood*, 561 U.S. at 332 (emphases omitted) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 83 (2005)).  The judgment under which Johnson "is now in custody was *not* the subject of his habeas corpus petition." (Warden's Suppl. Br., ECF 33, 5).

Critically, the Warden cites no controlling caselaw on point.  The cases he cites either apply in a different context or simply do not reach the issue he seeks to resolve.

B. *Second or Successive Jurisprudence—Non-Applicability*

The Warden's argument relies on one Supreme Court case—*Magwood*—and two Sixth Circuit cases—*Stansell* and *King v. Morgan*, 807 F.3d 154 (6th Cir. 2015)—as well as a district-court case (discussed below).  The Warden describes *King* as holding that, "if a

state-court collateral challenge leads to an amended judgment, the first habeas petition that follows the entry of the new judgment is not second or successive." (Warden's Suppl. Br., ECF 33, 4 (citing *King*, 807 F.3d at 157)). This framing reveals the weakness in the argument.

*Magwood*, *Stansell*, *King*: None of these cases are about mootness. Instead, they each interpret language in 28 U.S.C. § 2244(b), which sets the prerequisites for the filing of a "second or successive" federal habeas corpus petition. These cases address whether a criminal judgment that is amended during state postconviction proceedings is "new" in the sense that a prisoner filing a second-in-time petition need not comply with the § 2244(b) requirements for filing a successive petition. *Magwood*, 561 U.S. at 323–24, 330–31, 341–42; *Stansell*, 828 F.3d at 413–15; *King*, 807 F.3d at 155–57. In *Magwood*, for instance, the Supreme Court held that a death-row petitioner who successfully sought § 2254 relief, but then was resentenced to death, did not need to comply with § 2244(b) before filing a second-in-time petition that challenged the new death-sentence judgment. 561 U.S. at 331, 342.

Under the Warden's reasoning, a petitioner who receives a new judgment while a first habeas proceeding is still pending must abandon that proceeding and (presumably) file a new petition in the district court. But neither *Magwood* nor its Sixth Circuit progeny has any explicit application to that procedural chain of events. And these cases do not suggest that a federal court facing those circumstances loses jurisdiction over a remaining conviction.

The Warden makes a category error. He cites successor-petition caselaw to make a jurisdictional point. *Magwood*, *Stansell*, and *King* do not help there; they do not cross over. They stay in their category.

That leaves the district-court case: *Turner v. Hudson*, No. 2:07-CV-595, 2024 WL 3740442 (S.D. Ohio Aug. 8, 2024). Unlike the other cases the Warden cites, *Turner* dealt with circumstances similar to those presented here. But it is of no help. First, as an unpublished, district-court decision, *Turner* binds no one. And it carries no persuasive value here because the *Turner* court expressly held that it "need not decide whether Turner's instant petition is 'moot,' because even if a new petition is not required, it is certainly permitted." *Id.* at *4.

That conclusion leaves the Warden with no cases requiring his desired result.

## IV.

*Ineffective Assistance of Counsel*

Johnson argues that he received ineffective assistance of counsel both at trial and on direct appeal.

To establish ineffective assistance of counsel, Johnson must show that (1) counsels' performance was deficient—objectively unreasonable under prevailing professional norms—and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Prejudice exists if there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. It is unnecessary for us to address both prongs if Johnson's claim fails on one. *Id.* at 697. We judge trial and appellate counsel under the same standard. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

### A. Trial Counsel—Other Acts

Johnson argues that his trial attorneys were ineffective in allowing the jury to learn his criminal history.

#### 1. State Court

Johnson raised this claim three times. He raised it on direct appeal, and the Ohio Supreme Court held it meritless. *Johnson*, 858 N.E.2d at 1167–68. He raised the claim in his postconviction petition, this time supported by affidavits summarizing interviews with jurors—specifically, their reactions to various aspects of the trial. The court of appeals held the claim barred by res judicata because it was "raised and fully litigated" on direct appeal. *Johnson*, 2007 WL 1098106, at *10. Last, he raised the claim in successive postconviction proceedings, now supported by depositions of trial counsel. The court of appeals again held it barred by res judicata. *Johnson*, 2013 WL 1400607, at *4–5.

*2. Federal Court*

The district court held that the claim, as raised on direct appeal, had been decided on the merits, so AEDPA deference applied. But it found that the state courts wrongly applied res judicata to the claim as raised in the first round of postconviction proceedings (when Johnson added juror-reaction affidavits) and so reviewed that portion de novo. As for the claim as raised in the second round of postconviction proceedings (when Johnson added trial-counsel depositions), the district court noted that the state court held it barred by res judicata, then held that "trial counsel's statements made in their habeas depositions may not be considered by the Court." (R. 136, Op. and Order, PageID 11103). The district court made a sizable exception, however, when reviewing the claim as raised in the first postconviction round de novo: It then considered both juror-reaction affidavits *and* trial-counsel depositions. But no matter the portion reviewed and no matter the standard of review applied, the district court's conclusion was the same: The claim failed.

The Warden agrees that, if we reach the entire claim, it fails, but still maintains that the postconviction versions are procedurally barred.

*3. Preliminary Issues*

Here, we need not resolve the preserved-vs.-barred debate. For even if preserved, the juror-reaction affidavits and trial-counsel depositions do not alter our conclusion. Johnson cites the affidavits for an issue that is now moot: whether the alleged errors had a carryover effect on the jurors that harmed him in the penalty phase, resulting in his death sentence. Because the state court vacated Johnson's death sentence, his penalty-phase arguments are moot. Indeed, Johnson concedes that he "has already been resentenced by Ohio . . . and, therefore, has already received that requested relief." (Johnson's Reply & Suppl. Br., ECF 32, 18 n.2).

Furthermore, the depositions that Johnson cites to attack trial counsels' strategy get him nowhere. This is because his claim fails on the prejudice prong.

As for the standard of review to be applied, his entire claim fails even if reviewed de novo.

4. *Lack of Prejudice*

Johnson contends that trial counsel's ineffectiveness consisted of the following: revealing, during opening argument, his past criminal acts, then failing to object to witness testimony detailing that criminal history.  More specifically, the acts revealed included Johnson's illegal use of drugs and prior convictions for arson, domestic violence, escape, and assaulting a corrections officer.

Johnson details the perceived deficiencies of counsel's performance but provides scant grounds for finding prejudice in the guilt phase.  Instead, the bulk of Johnson's briefing focuses on sentencing issues.  Indeed, Johnson's opening brief states, "*all eyes* from the perspective of Johnson's trial counsel should have been intently focused on the sentencing phase." (Johnson's Br., ECF 27, 34).  When Johnson considers the guilt phase, he merely asserts the following: "There were legitimate issues about intent, whether a rape occurred, whether [Daniel] was dead before the kidnapping, and whether any of the felonies occurred during the course of the murder." (Johnson's Reply & Suppl. Br., ECF 32, 23; *see also* Johnson's Br., ECF 27, 45 (same)).  Although Johnson makes this argument twice, he never expands on it, leaving the attendant vagaries hanging.

*Johnson's concession of guilt.*  What's more, the argument sidesteps something.  Johnson conceded guilt of all charges.

In the guilt-phase closing argument, the trial court granted Johnson's request to represent himself, and his attorneys were reduced to standby-counsel status.  *See Johnson*, 858 N.E.2d at 1162.  The prosecutor had just concluded his initial closing argument by asking the jury "to return guilty verdicts as to the charges in the indictment in this matter." (R. 83-12, Trial Tr., PageID 7728).  Johnson then addressed the jury himself.  After beginning with the usual pleasantries—thanking the court and greeting the jurors—Johnson declared the following: "I don't dispute nothing [the prosecutor] just said.  I want you to return a verdict of guilty on each and every charge, ladies and gentlemen, for what I have done.  Yes, I'm guilty." (*Id.*).  To be clear, "every charge" would include all five counts (felony murder,

prior-calculation-and-design murder, kidnapping, rape, and aggravated robbery) and both death specifications (each the same: felony murder).

Johnson then spent the rest of his argument asking for a mistrial because (a) the victims and the jurors all shared the same race, while he did not, and (b) the judge allegedly had a conflict of interest.  At no point—either explicitly or implicitly—did Johnson retract his concession of guilt.

The practical implication of this approach is damning.  Considering Johnson's concession of guilt on all charges, it is not reasonably probable that the jury would have declined to convict him of every charge if only his criminal history had been kept from them.  Nevertheless, given that the state court now has found Johnson seriously mentally ill, we do not rely solely on his concessions at trial.

*Concessions by counsel.*  The trial judge immediately permitted Johnson's final argument "to be supplemented by stand-by counsel."  (*Id.* at PageID 7731).  Standby counsel supplemented Johnson's argument by ignoring it, advancing his own instead.  He conceded Johnson's guilt of three of the five counts: prior-calculation-and-design murder, rape, and aggravated robbery.  Doing so aligned with counsel's opening argument, in which he conceded prior-calculation-and-design murder. *See Johnson*, 858 N.E.2d at 1167.

Importantly, both Johnson and standby counsel conceded guilt on those three counts. And Johnson does not accuse standby counsel of ineffectiveness for making that concession; he does not even mention it.  So those concessions remain unchallenged.  As a result, even setting aside all the evidence of Johnson's guilt, it is not reasonably probable that, absent the other-acts evidence, he would have avoided conviction on those counts.  So those three counts—prior-calculation-and-design murder, rape, and aggravated robbery—are not at issue.

That leaves two counts: felony murder and kidnapping.  It also leaves the death specifications.  Standby counsel denied guilt of all of them.

Johnson was charged with both felony murder (Count 1) and prior-calculation-and-design murder (Count 2).  Attached to each was a death specification that was the same for each charge.

Standby counsel conceded guilt on the charge of prior-calculation-and-design murder but denied guilt on the attached specification.  As for the felony-murder charge, he denied guilt of both the substantive charge and the attached specification.  And he denied guilt on the separate charge of kidnapping (Count 3).

The precise felony murder charged in the first count was the act of purposely causing Daniel's death "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated robbery."  (R. 82-9, Indictment, PageID 2225).  And the recurring death specification was that the aggravated murder "was committed while the offender was committing, attempting to commit or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated robbery and the offender was the principal offender in the commission of the Aggravated Murder."  (*Id.*).  Standby counsel conceded that Johnson was the principal offender.

Counsel's denials went to other elements.  He denied the kidnapping in all three forms in which it appeared: as a substantive count, as an element of the felony-murder count, and as an element of the death specifications.  And although he conceded the substantive rape and aggravated-robbery counts, he denied the rape and aggravated robbery when used as elements of the felony-murder count and the death specifications.

Even if the jury doubted Johnson's competence as his own counsel and so assigned more weight to standby counsel's closing than to Johnson's, that leaves three charges unconceded: kidnapping (whenever it appeared) and rape and aggravated robbery (when used as elements of either felony murder or the death specifications).  Johnson's argument still fails.

*Kidnapping*.  To convict Johnson of kidnapping, the jurors had to find that Johnson "did by force or threat, restrain the liberty of another person, to wit: Daniel J. Bailey[,] to inflict serious physical harm on [him]."  (R. 83-12, Trial Tr., PageID 7744).  Standby counsel argued that "there's two things that that presupposes.  Number 1, you're alive and number 2, there was serious physical harm inflicted on [Daniel] after he was bound and hog-tied."  (*Id.* at PageID 7733).  According to counsel, neither applied here: Daniel was "effectively dead" when bound and hogtied, so there was no kidnapping.  (*Id.* at PageID 7734).

But "the evidence does not support Johnson's contention that Daniel had died before being restrained." *Johnson*, 858 N.E.2d at 1157. According to the testimony of the physician who performed the autopsy:

> Daniel was still alive when he was tied up: "Yes, there's no question he was alive. * * * [T]he skin reaction, the red hyperemia next to the bindings around his wrists shows that * * * the heart was still pumping while these tight bindings were around the wrists."

*Id.* at 1154 (alterations in original). That dispenses with the death-before-restraint argument.

Nor does the evidence support Johnson's argument that Daniel was dead before serious physical harm was inflicted *post*-restraint. As the trial judge put it,

> According to the evidence, [Daniel] would have spent his last moments of life in acute pain and substantial suffering while the physical harm done to his face and eyes were swelling up. The medical evidence further established that his brain swelled to the point of causing death, all the while the bindings that "hogtied" him were bruising or furrowing into his wrists and ankles.

(R. 82-9, State Sentencing Op., PageID 2247).

Indeed, it makes little sense to hogtie someone who already has died. Whether employing science or common sense (that sense common to all, not requiring specialized knowledge), the result is the same. The evidence did not support standby counsel's argument. Leaving out Johnson's criminal history would not have changed that outcome.

And that brings up an important point—the irrelevance of that history. Jurors are presumed reasonable. *Strickland*, 466 U.S. at 694–95. No reasonable juror would have thought that Johnson's criminal history had anything to do with how long Daniel lived after the attack. It is not reasonably probable that the jurors would have acquitted Johnson of the kidnapping charge but for the other-acts evidence.

*Rape and aggravated robbery*. The only argument standby counsel made to show that Johnson was not guilty of the rape and aggravated-robbery elements of the felony-murder count and the death specifications was that Johnson raped and robbed Tina, not Daniel. It is not probable that the jurors would have been persuaded to acquit Johnson but for the other-acts evidence. And even if they had, it would not have mattered. Finding kidnapping was enough to

"satisf[y] the necessary element for both felony murder and the specification." *Johnson*, 858 N.E.2d at 1160. The jury convicted Johnson of all counts and specifications. Concealing Johnson's criminal history would not have altered that outcome.

Johnson has failed to show any prejudice.

B. *Appellate Counsel—Confrontation Clause*

Johnson argues that appellate counsel were prejudicially ineffective on direct appeal to the Ohio Supreme Court. Specifically, he asserts that they failed to present a meritorious claim under the Sixth and Fourteenth Amendments that the state violated Johnson's right to confront witness Mickey Alexander, after the state introduced Alexander's hearsay statements. In doing so, says Johnson, the state violated Johnson's constitutional rights under *Crawford v. Washington*, 541 U.S. 36 (2004)—a violation appellate counsel should have raised.

This claim, too, Johnson raised to the state courts three times. He raised it in an application to reopen his direct appeal, which the Ohio Supreme Court denied. *Johnson*, 870 N.E.2d at 728. He reraised the claim in a second reopening application, supported by the depositions of direct-appeal counsel, but the Ohio Supreme Court again denied reopening. *Johnson*, 988 N.E.2d at 577. And in his successive postconviction petition, he raised the claim supported by the same depositions. The state court of appeals held it barred by res judicata. *Johnson*, 2013 WL 1400607, at *6.

The district court held that only when the Ohio Supreme Court denied the first reopening application had a state court reached the merits of the claim; the other two times Johnson raised it, the state courts had rejected it on procedural grounds. Reviewing only the preserved version of the claim, the district court held that it did not get past the § 2254(d) barrier—adding that the claim would fail even if the depositions were considered. The Warden defends that ruling on appeal.

Two detectives testified at trial about information they received from Alexander, Johnson's cellmate who learned the location of the money Johnson stole from Tina. The detectives testified that, based on Alexander's information, they found the money (minus what

Johnson paid to the cabdriver) and the bank envelope Johnson had hidden when he ran from the pursuing officers. *Johnson*, 858 N.E.2d at 1155.

Although trial counsel made more than one objection to the detectives' testimony, and those objections were mostly sustained, the State continued introducing the Alexander information. Trial counsel did not continue objecting, Johnson says. He contends the information was testimonial hearsay and its introduction through the detectives—when Alexander was available to testify—denied Johnson the opportunity to cross-examine Alexander, which violated the Confrontation Clause. Johnson contends he was prejudiced by this evidence because it corroborated the testimony of Tina, bolstered her credibility, and helped prove him guilty of aggravated robbery.

Even if we reviewed de novo and assumed that the state violated Johnson's constitutional rights under *Crawford*—that the trial court erred in admitting the detectives' testimony about Alexander, that trial counsel were professionally deficient in not continuously objecting, and that appellate counsel were professionally deficient in not raising the claim—there still is no prejudice.

Johnson and standby counsel both conceded that Johnson was guilty of robbing Tina. True, standby counsel argued Johnson's innocence of aggravated robbery when used as an element of felony murder and the death specifications. But that argument was based on the fact that Johnson robbed Tina, not Daniel—which is still a concession that Johnson robbed Tina. Thus, it is not reasonably probable that exclusion of the Alexander evidence would have changed the outcome of the guilt phase.

For these reasons, Johnson has failed to satisfy the requirements of § 2254(d)(1) or (d)(2).

**V.**

We AFFIRM.